523 So.2d 1348 (1988)
David SNYDER, Plaintiff-Appellant,
v.
Stacy TAYLOR, et al., Defendants-Appellants/Appellees.
No. 19,426-CA.
Court of Appeal of Louisiana, Second Circuit.
March 30, 1988.
Rehearing Denied April 28, 1988.
*1349 Blackwell, Chambliss, Hobbs and Henry by James A. Hobbs and Larry Arbour, West Monroe, for plaintiff-appellant.
William J. Doran, Jr., Norman L. Sisson, Sharon F. Lyles, Frank J. Gremillion, Baton Rouge, for defendant-appellant/appellee Dept. of Transp. & Development.
Theus, Grisham, Davis & Leigh by James M. Edwards, Monroe, for defendants-appellees Stacy Taylor, Delta Const. Co. & Travelers Ins. Co.
Before HALL, MARVIN and NORRIS, JJ.
MARVIN, Judge.
In this action that arose out of an intersectional collision between a truck and a car, and from a judgment awarding personal injury damages to the guest passenger in the car, DOTD appeals a judgment that allocated fault equally between DOTD and the car driver.
Plaintiff also appeals, seeking to increase the $789,000 award, and answers DOTD's appeal, seeking to increase the allocation of fault to DOTD to 60 percent.
The truck driver, who was not found at fault, answers the other appeals, seeking first that we affirm the finding that he was not at fault. Alternatively and in the event he is found comparatively negligent, the truck driver contends that the award to plaintiff should be reduced, as excessive, and that we should not consider the fault of the car driver in allocating comparative fault between him and DOTD.[1]
We consider the respective fault issues raised by each litigant, including the third-party or cross claims of the litigants.
We amend the judgment to find the truck driver comparatively negligent. Agreeing that the fault of the car driver should not be considered, we allocate the viable fault solely between DOTD and the truck driver.
We affirm the judgment in all other respects.

FACTS
This plat depicts the accident scene:
*1350 
*1351 The accident occurred about 8:00 a.m. on a clear and dry weekday, August 6, 1980. For their Pennsylvania employer, Betz Laboratories, plaintiff Snyder and his driver and co-employee, Dachille, were on a business mission to Sterlington, about 30 miles northwest of Monroe, in a rented Ford Mustang. They were proceeding northerly on La. 2 Extension toward Sterlington as shown on the above plat. Dachille had driven from Monroe to Sterlington and had traversed the intersection on Monday and Tuesday preceding the Wednesday accident. On at least one of those days Dachille was following another car that was leading him to Sterlington.
The defendant truck driver, Taylor, was proceeding southeasterly in a Mack dump truck toward Bastrop. As the vehicles approached the intersection, Taylor was proceeding about 35 mph, within the 55 mph speed limit, and Dachille was proceeding less than 25 mph.
Approaching the triangular traffic island south of the intersection, the northbound traffic lane of La. 2 Extension increases its 12' standard width more than three times as it curves northwesterly and becomes La. Hwy. 2 to Sterlington. A white stripe is painted on the right of the northbound lane of La. 2 Extension. Painted double yellow lines on La. 2 Extension follow the northwesterly curve and continue unbroken onto La. Hwy. 2. This painted double yellow line is shown on the above plat as the center line (C/L). The blacktop surface and painted lines of La. Hwy. 2 and La. 2 Extension were applied more recently than on La. Hwy. 2 east of the intersection and are uniform in appearance and wear. La. Hwy. 2 east of the intersection has a more worn and faded appearance.
The yield sign located south of the northwest corner of the traffic triangular island is 5.2 feet east of the painted line of the northbound lane of La. 2 Extension. In photographs it also appears to be about five feet south of the north leg of the triangle. DOTD intended that all northbound or northwest bound La. 2 Extension traffic would obey the yield sign. Traffic proceeding northwesterly in such a manner would not, however, have to cross the double yellow line. On the other hand, traffic proceeding southeasterly from Sterlington toward Bastrop on La. Hwy. 2 must cross the double yellow line that extends from La. 2 Extension onto La. Hwy. 2 to Sterlington.
As he approached the intersection, the Mustang driver, Dachille, saw what we have thus far attempted to depict and describe, that is, the manner in which La. 2 Extension appeared to curve northwesterly as indicated by the continuous double yellow (C/L) line; the Mack truck appearing to be traveling in the direction from which Dachille had come, the traffic island yield sign then toward the right and rear of Dachille.
Dachille testified that the driver of a pickup, approaching the intersection on La. Hwy. 2 from the east (on Dachille's right) appeared to motion to him to continue traveling toward Sterlington. Dachille said that as he did, he immediately saw the Mack truck in front of him in his lane of travel. The left front of the Mustang collided with the front right side of the truck.
The investigating state trooper wrote on his report:
This is the second accident of this nature that this officer has investigated at this location within a year, since the new four lane U.S. 165 was built. The LA 2 extension continues to cause problems as a majority of all the north bound traffic still uses it instead of the LA 2U.S. 165 intersection. This officer recommends that the LA 2 extension be terminated so that all of the traffic travels on LA 2.
Dachille said that the truck gave every appearance of staying on its side of the double yellow line and continuing south, and that he assumed that the yield sign governed only traffic which would be proceeding due north and onto the parish road. Dachille was found 50 percent at fault by the trial court for not obeying the yield sign.
The truck driver, Taylor, unlike Dachille, lived in the area and was very familiar with the confusing nature of the intersection and its danger. He saw a "blue car," the *1352 Mustang, as it and his truck approached each other. He knew he had the right of way. He knew that he would be required to cross the double yellow lines to continue toward Bastrop and, as well, the "path" of the Mustang, whether the Mustang continued straight or followed the curve toward Sterlington. Taylor said that as he drove nearer to the intersection he placed his attention on a brown car that was proceeding on La. Hwy. 2 toward Sterlington [which incidentally would not cross Taylor's path as long as it stayed on its right side of the road].
Taylor said he had signaled with his left turn blinker his intention to continue on La. Hwy. 2 and that when he turned his attention away from the brown car he saw the Mustang and jammed on his brake only "split seconds" before the Mustang hit him. He did not say whether he sounded his horn. Taylor was not found negligent by the trial court.
Witness Curtis, who had stopped his pickup truck headed south on the parish road in obedience to a stop sign facing him, could not recall whether the blinker signal on the truck was flashing. He saw both vehicles and realized that a collision was imminent. He said he "could just tell by the speed that ... they were going to hit."
Witness Odom, who was traveling 3-4 car lengths behind Taylor, his subordinate employee, also realized that a collision was imminent. He testified he realized this when the Mustang was 50-60 feet south of the intersection. In a deposition, however, Odom denied seeing the Mustang before the accident, seeing a blinker flashing on the truck, or hearing a horn signal from the truck.
Witness Wallace, who was traveling in the brown car on La. Hwy. 2 from Bastrop toward Sterlington, testified that the left blinker signal of Taylor's truck was flashing and that Taylor blew his horn immediately before the collision. Taylor was not asked whether he blew his horn.
The investigating state trooper cited Dachille for his failure to obey the yield sign. He did not note or recall any significant skid marks made by either vehicle. The trooper agreed that the placement of the yield sign and configuration of the intersection made the intersection "confusing."
An expert witness, Neel, opined that the intersection was dangerous and confusing and that the yield sign appeared to apply only to traffic proceeding northerly onto the parish road. He suggested that an additional channeling island at the intersection with an additional yield sign would clearly direct motorists traveling as Dachille was traveling to yield to traffic on La. Hwy. 2. He also suggested that La. Hwy. 2 east of the intersection should be barricaded and closed. All south and eastbound traffic on La. Hwy. 2 or La. 2 Extension merges into U.S. 165 near the accident scene. Neel opined that the cost of either remedy would be only a "few thousand dollars" and would require little time and effort.
A July 16, 1980, letter from a DOTD's chief engineer directed the closure of La. Hwy. 2 east of the intersection and the creation of an additional channelizing island. Earlier DOTD interoffice memos recommended the same measures instructed in the 1980 letter. This evidence was introduced by plaintiff. DOTD did not offer expert testimony in this area but obtained Neel's admission that he did not know when the intersection was designed or whether it met design standards in effect at the time it was designed.

LIABILITY OF DOTD
Accepting the testimony of the expert and the lay witnesses about the dangerous and confusing nature of the intersection, the trial court found DOTD at fault whether under the strict liability of C.C. Art. 2317 or under the traditional negligence analysis of Art. 2315. We find no error in these conclusions.
DOTD relies on this language from Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1173 (La.1986), DOTD and asserts that DOTD has no duty to upgrade state highways to modern standards or to warn about the deficiency:

*1353 ... [T]he failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect.
DOTD should not read Myers too broadly.
Myers involved Greenwell Springs Road, which was constructed sometime prior to 1927 and was renovated or improved in 1927, 1939, 1958 and 1977. Evidence established that the 1927, 1939 and 1958 respective improvements complied with all applicable standards then in effect. The renovations made in 1977 were in "technical violation" of DOTD's then standards for the overlay and widening of rural roads. Myers emphasized, however, that notwithstanding the "technical" violation of design standards, the 1977 renovation actually improved the road and made it safer. The court also explained that
In order to bring Greenwell Springs Road into compliance with these standards, the state would have to acquire a new right of way, fill in the roadside ditch, widen each shoulder by four to five feet, dig a new drainage ditch and remove all obstacles within 30 feet of the roadway. 493 So.2d 1170 at 1173.
Here DOTD failed to establish when the intersection was built and whether it then met standards in effect. Plaintiff's expert opined that the intersection did not meet current standards and that correcting the design deficiency would have been relatively simple and inexpensive. Myers did not find that the Greenwell Springs road presented an unreasonable risk of harm. Here the trial court's conclusions that the intersection was "faulty in its design and presented a hazardous condition to the traveling public" is supported by the record. We agree and shall not disturb these findings. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

LIABILITY OF TAYLOR
A driver with the right-of-way has the right to assume the other driver will yield the right-of-way until he sees or should see that the other driver is not going to yield. Daniels v. Allstate Ins. Co., 469 So.2d 352 (La.App. 2d Cir.1985). The controlling factual issue is whether Taylor should have seen that Dachille was not going to yield.
The design of the highway on which Taylor was traveling from the west required him to either continue south on La. 2 Extension or east on La. Hwy. 2. If his destination was toward the east, as he said, he was aware, as he admitted, that he would have to cross the double yellow center line and Dachille's path.
Taylor diverted his attention away from the Mustang whose path he intended to cross. The westbound car (Wallace) on La. Hwy. 2 was not a potential hazard unless he indicated a 90 degree left turn. He gave no such indication to Taylor. Dachille's vehicle, on the other hand, was not headed straight and northerly toward the parish road, and parallel to the white painted line on Dachille's right, but was following for about 100 feet before impact, the path of the double yellow center line northwesterly and into the curve of La. 2 Extension and of La. Hwy. 2 toward Sterlington.
Dachille was headed in a direction which Taylor should have known would lead to a collision unless Dachille or he yielded. Taylor saw Dachille's blue Mustang 50-60 feet south of the intersection and at a time when Taylor was about 1-½ times that distance from the intersection because of the variance of their respective speed. At no time did Dachille slow the Mustang or give any other indication that he was going to yield to Taylor.
We conclude that Taylor should have seen Dachille following the curve when Dachille was 60 or more feet away from impact. Taylor said he saw the Mustang's approach but thereafter diverted his attention to the "brown car." Notwithstanding that Taylor knew he had the right of way, had his blinker on, and perhaps sounded his horn, he could have seen that Dachille was not going to yield to him had he been looking.
Taylor said that he did not know how far away the brown car was when he drove across the double yellow lines to continue toward Bastrop and that he was "too *1354 close" to the blue Mustang when he realized they were going to collide.
Did you divert your attention to the brown car such that when you were looking at the brown car you could not see the blue car?
Yes. You could not see the blue car.
And then when you looked back from the brown car what happened?
I was right there ... I was at the intersection....
And then what happened?
The Dachille car hit me.
* * * At the time you started ... [across the yellow lines] ... you were aware ... that the [Mustang] was coming and you were going to cross in front of it?
Yes ... I knew where the [Mustang] was. I knew where it was on the road, I knew what road he was on ...
But you didn't know how far [away] he was or what he was doing ...?
I was glancing over at him. I couldn't tell you exactly what he was doing, no.
Taylor's superior, Odom, testified:
And when you saw the blue car, he was, I believe, how far from the point where the collision occurred?
Around fifty to sixty feet. * * *
... [A]t that point, you knew that car wasn't going to stop?
I just believed that he wasn't going to stop, he looked like he wasn't, yes sir. * * *
... So, generally at that point in time, the Stacy Taylor truck was from a hundred to a hundred fifty feet from the blue car ...?
Possibly, yes sir, it might not be that far.
The witness Curtis also deduced that the two vehicles were going to collide while both were some distance from the intersection.
Taylor did not realize the collision was imminent until "split seconds" before, because he was not paying attention to the Mustang as they approached the intersection. Had Taylor kept a proper lookout, he too should have been able to make this determination. Dachille's car and direction of travel was clearly visible to Odom or to any driver in Taylor's position. Taylor would not necessarily have needed to bring his truck to a stop. He could have continued, unimpeded by any traffic, on La. 2 Extension to avoid the accident.
A motorist who turns under the protection of a green arrow nonetheless is negligent in doing so if the accident could have been avoided if the turning motorist "had been attentive and seen what should have been seen." Daniels v. Allstate Ins. Co., supra. A sharp and attentive lookout is required of all motorists. See, e.g., Tennis v. Hartford Insurance Co., 523 So.2d 278 (La.App. 2d Cir.1988) and authorities cited therein; Reed v. American Motorists Ins. Co., 355 So.2d 948 (La.App. 3d Cir. 1977), writ denied.
Other cases involving a collision of two vehicles causing injury to an innocent plaintiff have shifted the burden of proof to the motorists to exculpate themselves from any substandard conduct. See, e.g., Eason v. Hartford Accident & Indemnity Co., 327 So.2d 187 (La.App. 2d Cir.1976), Poche v. Frazier, 232 So.2d 851 (La.App. 4th Cir. 1970). Even without such a presumption, we must find that the trial court was clearly wrong in its failure to assess some fault to Taylor.
The great preponderance of the evidence compels the conclusion that Taylor was negligent because of his knowledge and experience with the intersection and his opportunity to realize before the final "split seconds" that a collision was reasonably probable to occur. Having once seen the approaching Mustang and no indication that it was going to obey the yield sign, Taylor should not have thereafter ignored it and "blindly" relied on his right of way. Daniels v. Allstate Ins. Co., supra. The existence of a reasonable factual basis for a finding of a trial court does not preclude an appellate court from concluding the trial court was clearly wrong on that finding. Arceneaux v. Domingue, supra, at p. 1333.

ALLOCATION OF FAULT
The trial court allocated fault equally between DOTD and Dachille, plaintiff's *1355 co-employee. Because Dachille is not before the court and is exempt from tort liability under the worker's compensation statutes, the allocation of a percentage of fault to him is irrelevant. See Franklin v. Oilfield Heavy Haulers, cited in footnote one, supra. Plaintiff Snyder is not at fault.
As between the two defendants who are before the court, we must compare and allocate negligence in the light of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
Whether the conduct in question resulted from inadvertence or involved an awareness of the danger? DOTD was acutely aware of the danger posed by the intersection. Taylor was also aware of the danger but his conduct was inadvertent. He was inattentive.
How great a risk was created? DOTD's conduct posed a risk to the traveling public in general. Taylor's conduct posed a risk to the occupants of the Mustang.
The significance of what was sought by the conduct? With little effort and reasonable attentiveness by Taylor, the accident would not have happened. He sought merely to proceed to his work-related destination. With greater effort, but involving relatively little time and expense, according to plaintiff's expert, DOTD could have lessened the probabilities of such accidents. A few weeks before the accident DOTD's chief engineer recognized the need for changing the intersection's design and instructed that changes be made.
The capacities of each actor, whether superior or inferior? DOTD does not suggest that it did not have the capacity to detect the need for and carry out modifications at the intersection earlier. Taylor, as a private citizen, could not have made the intersection itself safer even should he have had the means and time to do it. His capacity in that respect was greatly inferior to that of DOTD. DOTD, on the other hand, is powerless to prevent motorists such as Taylor from being inattentive and negligent.
Extenuating circumstances? Taylor, of course, had the right of way, but could not blindly rely on it. DOTD does not suggest any extenuating circumstances, except to argue that its duty did not extend beyond following the design standards in existence when the intersection was constructed. DOTD argues in this respect that the burden of proving faulty design at whatever time rests upon the plaintiff who alleges faulty design. All other issues aside, DOTD's failure to properly warn of the dangerous nature of the intersection is actionable neglect.
Thus comparing and weighing the respective conduct of the two defendants before the court, we conclude that the greater fault lies with DOTD and not with the inattentive truck driver. We allocate that fault 60 percent to DOTD and 40 percent to the truck driver, Taylor.

QUANTUM
General Damages:
Plaintiff suffered multiple and severe injuries. He was unconscious in the highway for 40-45 minutes before an ambulance arrived. The witness Curtis said that before the ambulance arrived he observed that
The bone was sticking out of [plaintiff's] left thigh. His knee was turned around almost touching his left buttock area. His right foot was turned completely around, and his ankle bone was sticking through his sock.
Curtis said that plaintiff was screaming as he held him down and covered him with a blanket.
Plaintiff, his wife, and experts testified about the past and present extent of his injuries and disabilities. Depositions of Dr. Bailey and Dr. Moyer, the orthopedic surgeons who treated plaintiff, were introduced. Dr. Bailey said:
He had an obvious open fracture of the left femur, or the thighbone, between the knee and the hip, that the bone was broken and out through the skin. * * *
He had a closed, or a fracture without protrusion of the bone through the skin of the same leg below the knee, with *1356 obvious deformity and swelling in that area, and an obvious fracture that was out of line. [Both bones below the knee were broken.] * * *
He had a dislocation of the right ankle, again open with the entire lower tibia, or shinbone, and the top of the ankle exiting, or stuck out, through the skin, also. * * *
[The right foot] was attached, but was rotated about 130 degrees ... He had no pulse in his foot.
Dr. Bailey stated that the repair of plaintiff's right ankle and foot and left leg required several surgeries in which plates and pins were inserted and bone grafts were performed.
Although the most serious injuries suffered by plaintiff were those to his lower extremities, plaintiff also suffered a broken and lacerated nose, a lacerated eyelid, a lacerated lip, a severely lacerated left forearm, and broken and disaligned teeth. Plaintiff underwent nine separate surgical procedures.
Dr. Bailey expected plaintiff to suffer continued pain in his right ankle and weakness in his left leg due to arterial injuries.
Dr. Moyer stated that plaintiff has restricted motion of 20 percent in his right ankle and that the left tibia (lower leg) is bowed or malaligned. Dr. Moyer believed that the likelihood of a degenerative process of the left knee was "very, very good" due to the malalignment in the left leg. He recommended that plaintiff refrain from any activity that would put pressure on his legs and suggested swimming or bike riding for physical activities.
Plaintiff testified at trial almost six years after the accident. He said he continues to suffer pain and stiffness in his right ankle, numbness in his left leg, lower back pain and stomach problems due to the extensive medication he has taken since the accident.
Plaintiff, a healthy 28-year-old engineer in 1980, was physically active and enjoyed jogging and snow skiing before the accident. He has since been unable to engage in such activities.
Plaintiff suffered what was described as severe pain, especially in the hours and days immediately following the accident. He was hospitalized more than 30 days. He was in the early stages of a career which required physical exertion. Plaintiff is forever prevented from participating in many of the previous physical activities he enjoyed and continues to suffer pain with substantial prospects for further degenerative problems.
Plaintiff's physical injuries are comparable to those suffered by the young plaintiff in Klein v. Himbert, 474 So.2d 513 (La. App. 4th Cir.1985), who was awarded $300,000 in general damages. Unlike the plaintiff in Klein, supra, plaintiff's disabilities also prevent him from being a physically active civil engineer, a career for which he was educated and trained.
Trial courts are given great discretion in determining damages for pain and suffering. The trial court's award of $325,000 general damages is not an abuse of that discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Past and Future Loss of Earnings; Impairment of Earning Capacity:
Plaintiff returned to his previous position as a chemical engineer on June 1, 1981. He was unable to do many of the physical things required of an engineer such as lifting and climbing. His employer terminated him in January 1983. Plaintiff's layoff may not have resulted from his disability, but from a reduction in work force. It is clear, however, that plaintiff's injuries prevent him from fully engaging in physical activities. Even DOTD's vocational expert, Mr. Duhe, agreed that plaintiff could not perform the physical tasks required of a chemical engineer and that he would be permanently restricted to sedentary employment.
When plaintiff returned to work in 1981, his salary was $26,200. When he was laid off in 1983, his salary was $30,400.
Following unsuccessful attempts at self-employment for about two years, plaintiff obtained a position with General Electric in September 1985. His title is Computer *1357 Systems Engineer and his starting salary at G.E. was $32,000.
Both plaintiff and DOTD presented depositions and testimony of vocational experts and economics experts. Mr. Duhe, DOTD's vocational expert, admitted that, on the average, the chemical engineering field would have presented plaintiff with greater salary potential than would the computer engineering field. For the 1982-83 period, it was shown that top-level chemical engineers made, on the average, $22,738 more than top level computer engineers. Duhe, however, argued that the G.E. pay scale appeared to be exceptionally high and that plaintiff's salary potential with G.E. appeared to be much the same as it would have been as a chemical engineer. Plaintiff contends he is less suited for the computer field than the majority of his co-workers at G.E. who possess advanced degrees in mathematics or computer science. Plaintiff has a B.S. in chemical engineering and an M.B.A. Duhe admitted he had no knowledge of G.E.'s criteria for promotions and concedes that despite G.E.'s above average pay scale plaintiff could progress at a slower rate than his co-workers who possess better educational backgrounds.
DOTD also presented the expert economic testimony of Prof. Burford. In his determination of loss of past earnings, Burford did not include plaintiff's lost wages between the time of the accident and his return to work several months later.
The trial court explained its ruling on the issues of past and future loss of earnings with reasons which we adopt.
The evidence established that plaintiff was not able to perform his duties as a project engineer satisfactorily after the accident. Even if plaintiff did lose his job because the company was reducing its work force, he was not re-employable in the engineering field that he was in before the accident.
Plaintiff claims past loss of earnings of $111,864.00. If the loss of earnings for the period of plaintiff's complete disability (August 1980 to June 1981) is added to the calculation of defendant's economist, the estimates of past loss of earnings by the parties are very close (i.e. compare $22,250.00 + $92,657.00 = $114,907.00 to $111,864.00). Plaintiff is awarded $111,864.00 for past loss of earnings.
In regard to loss of future earnings, the Court does not accept the conclusions of either economist. David T. Bunin, an actuarial economic consultant, gave testimony for plaintiff. Mr. Bunin based his calculations on information compiled by Dr. Jasen Walker, a psychologist and rehabilitation counselor. Mr. Bunin concluded that plaintiff will suffer an average annual loss of $37,000.00 for each year remaining in his work life expectancy. He assumed the inflationary factor would be offset evenly by the discount factor and computed losses of $1,143,300.00 if plaintiff worked to age 65, and $1,328,300.00 if he worked to age 70.
The Court considers these projections far too high. Plaintiff has the ability and motivation to succeed in his new vocation. He will have [some] opportunities for advancement and, based upon his past record, he will take advantage of these opportunities. Although a wage differential will develop over the period of plaintiff's work life expectancy, the Court does not believe it will be as great as the estimate of Mr. Bunin.
The opinion of defendant's expert, Dr. Roger L. Burford, was based upon a projection of the differential of plaintiff's beginning salary at General Electric versus the estimated Betz Laboratory wage at the same time ($1,091.00 difference in Fall of 1985), both increased at the same rate, yielding a total loss of $20,000.00 to $24,000.00 over the period of his work life expectancy.
The Court rejects this approach because the evidence supports the premise that plaintiff would have advanced farther, faster, in his pre-injury vocation. Plaintiff has serious physical limitations. He is also educationally handicapped in the computer program field because he does not have degrees in mathematics or computer science. Dr. Jasen Walker described the limits on plaintiff's career path as follows:

*1358 ... So, while he's making $32,500, that's where he's going to stay. He will get those merit or promotional increases that we expect that GE will provide or some other company, but he won't progress the way he did before his accident. (Dr. Walker's Deposition, p. 20)
Upon considering all of the evidence on this issue, the Court concludes that the differential between a projection of plaintiff's pre-injury wages and post-injury wages, including fringe benefits, will reach $30,000.00 by the time of his retirement. When the average annual loss for this period ($15,000.00) is multiplied by plaintiff's work life expectancy (30.5 years), and reduced by a net discount factor (2.5% per year compounded annually), loss of future earnings and fringe benefits of $317,500.00 are computed. This sum is awarded to plaintiff.
Trial courts have much discretion in the determination of lost wages, especially the loss of future wages or earning capacity. By their nature, such damages are speculative, and salary before and after the injury is not controlling. Klein v. Himbert, supra. We find no abuse in the trial court's award of $111,864 for past loss of earnings and $317,500 for loss of future earnings, or impairment of earning capacity.
Past and Future Medical:
The trial court's award of $34,652.57 for past and future medical is not disputed and is not disturbed.
The judgment against DOTD, rendered and signed March 25, 1987, itemized plaintiff's award as follows:

Pain, suffering, injuries $325,000.00
Past and future medicals 34,652.57
Past loss of earnings 111,864.00
Future loss of earnings 317,500.00
 ___________
TOTAL DAMAGES $789,016.57

ISSUES ARISING FROM AMENDED JUDGMENT
The trial court found DOTD and Dachille, plaintiff's co-employee, equally at fault (50 percent each). We have not compared, but have ignored, Dachille's fault because of the statutory immunity conferred by the worker's compensation law. See Franklin, cited supra, fn. 1.
Plaintiff Snyder, in the main demand, and DOTD, in its third-party demand, sued Taylor without joining his liability insurer (Travelers) or his employer. DOTD's third-party demand seeks contribution from Taylor under CCP Art. 1111. Taylor and Travelers cross-claimed against DOTD to seek contribution under CCP Art. 1071. CC Art. 1805, perhaps by oversight, does not expressly authorize a party to seek contribution by way of a cross-claim. See former CC Art. 2103. A party is authorized by CCP Art. 1071 to seek contribution by way of a cross-claim against a co-party. For problems relating to contribution, see Thomas v. W & W Clarklift, Inc., 375 So.2d 375 (La.1979); Foster v. Hampton, 381 So.2d 789 (La.1980); and Comment, Prescribing Solidarity: Contributing to the Indemnity Dilemma, 41 La.L.R. 659 (1981).
DOTD and Taylor, at least, each should have judgment against the other for contribution. See Holmes v. State Through Dept. of Highways, 466 So.2d 811 (La.App. 3d Cir.1985). See 41 La.L.R. 659, 687, supra. Issues emanating from Act 373 of 1987, amending CC Art. 2324 B, are not raised by the litigants and are not considered here.

DECREE
We affirm the damage award of $789,016.57 in favor of plaintiff and amend to decree that the judgment is against defendants DOTD and Taylor with legal interest from judicial demand. We allocate Taylor's fault at 40 percent and DOTD's fault at 60 percent. Costs of appeal are assessed in the same percentages to defendants. DOTD, of course, is responsible only for costs as the law allows.
We amend to decree judgment allowing contribution in favor of DOTD and against Taylor and in favor of Taylor and against DOTD for any sums paid, respectively, by either of them on the judgment on the main demand up to the percentages of fault herein respectively allocated to each, 40 percent to Taylor and 60 percent to DOTD.
*1359 In all other respects the judgment is affirmed.
AMENDED, and as amended, AFFIRMED.
Before HALL, MARVIN, SEXTON, NORRIS and LINDSAY, JJ.

GRANTING JOINT MOTION TO AMEND DECREE; DENYING APPLICATION FOR REHEARING
PER CURIAM.
After the opinion of this court was rendered, counsel for Taylor and Travelers Insurance Company, counsel for the State Department of Transportation and Development, and counsel for plaintiff Snyder jointly moved to amend the decree of this court to correspond to off-the-record stipulations made before the appeal that
Pursuant to previous stipulations and agreements reached between your joint movers herein, it was agreed that, at the time of the accident which was at issue in this proceeding, the Travelers Insurance Company had in full force and effect a public liability motor vehicle insurance policy which insured Stacy Taylor against liability for his negligence in the operation of the truck which he was driving at the time of the accident at issue herein, said policy providing coverage in the principal amount of FOUR HUNDRED NINETY THOUSAND AND NO/100 ($490,000.00) DOLLARS.
Now therefore and in accord with the joint motion, the decree of this court is amended to adjudge and declare that Travelers Insurance Company is solidarily liable with defendant Stacy Taylor to plaintiff David Snyder up to the principal sum of $490,000 with legal interest thereon from judicial demand and allowing contribution in favor of Travelers Insurance Company and against the State Department of Transportation and Development for any sums paid by Travelers Insurance Company on the judgment on the main demand in excess of the 40 percent portion of that judgment allocated to defendant Stacy Taylor.
As thus amended on the joint motion of the litigants, our opinion is reinstated and the application for rehearing is denied.
NOTES
[1] The car driver was a co-employee of the plaintiff and both were in the scope and course of their employment. The co-employee, like the employer, even though negligent, is absolutely immune from tort liability at all levels, even from contribution to another tortfeasor who is not immune. This immunity is expressly declared in the worker's compensation law and has been repeatedly upheld. The fault of the statutorily immune, but negligent, actor in such a situation is not compared with other actors who are jointly negligent. See Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3d Cir.1985), writ denied, and authorities cited therein.

Compare circumstances where the court considers the fault of others who, though not statutorily immune, are unknown and who are not before the court. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.1987), writs denied.