605 So.2d 187 (1992)
HAE WOO YOUN
v.
MARITIME OVERSEAS CORP., Atlantia Tanker Corp., and Assuranceforengen Gard.
No. 91-CA-407.
Court of Appeal of Louisiana, Fifth Circuit.
July 27, 1992.
Rehearing Denied October 19, 1992.
Writ Granted on One Application; Writ Denied on Another Application December 21, 1992.
*191 Paul Due, Due, Smith & Caballero, Baton Rouge, Gordon Crawford, Gonzales, Lewis Unglesby, Unglesby & Barrios, Baton Rouge, for plaintiff, appellee.
F. Scott Kaiser, Thomas Kiggins, Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, M.D. Yaeger, Terriberry, Carroll, Yancey & Farrell, New Orleans, James B. Kemp, New Orleans, for defendants, appellants.
Before BOWES, GRISBAUM and WICKER, JJ.
BOWES, Judge.
Plaintiff, Hae Woo Youn, filed suit for damages, naming as defendants Maritime Overseas Corporation (MOC) and Atlantia Tanker Corporation (Atlantia) under the Jones Act, 46 U.S.C.App. Section 688 and also the general maritime law pursuant to the "savings to suitors" clause of 28 U.S.C. Section 1333. Youn subsequently amended his petition to also name, as a defendant, Assuranceforeningen GARD (GARD), the marine liability insurer for MOC and Atlantia. After trial on the merits, judgment was rendered in favor of plaintiff and against all defendants, in solido, for $1,703,864.00, plus interest and costs. After the denial of defendants' motions for new trial, this appeal was perfected. We amend and as amended, affirm in part and remand in part the judgment of the trial court.

*192 FACTS
Plaintiff, Hae Woo Youn, was the boatswain ("bosun") on the M/T Atlantia, a Liberia oil tanker owned by Atlantia. The M/T Atlantia was operated by and the crew furnished by MOC. On May 23, 1989, Youn, and two other crew members, working under Youn's instructions, were using the ship's port winch preparing to hoist the ship's gangway back on board in preparation for the ship's departure. The winch controls consist of a lever and a steam valve. A crew member, O/S Hae, locked the control lever into place (direction) and then opened the steam valve to start the rotation of the gypsy head drum, which pulls in the slack of the wire cable used to hoist heavy objects. The steam valve opened too quickly, causing the drum to spin too fast and out of control, which resulted in the cable coming off the gypsy head and whipping around uncontrollably on the deck floor. Plaintiff called to Quartermaster Choi to engage the stopper to keep the crane boom from falling, however, Choi became frightened and abandoned his post. Youn ran to the stopper and en route there, was hit by the cable, causing serious and permanent injury and deformity to his left leg.

ISSUES: MOC AND ATLANTIA
On appeal, MOC and Atlantia allege the following assignments of error:

1.
If the district court had subject matter jurisdiction, it erred in denying defendants the right to a jury trial.

2.
The trial court erred in assuming jurisdiction because Youn designated his suit as an "admiralty or general maritime claim" pursuant to La.Code Civ.P. art. 1732(6) thereby invoking the exclusive jurisdiction of the federal admiralty courts.

3.
The trial court erred in finding that the M/T ATLANTIA was unseaworthy and that such condition caused Youn's injuries.

4.
The trial court erred in finding that defendants were negligent and that such negligence caused Youn's injuries.

5.
The trial court erred in finding no comparative negligence on the part of Youn, who chose to use an unsafe procedure because it was "faster" and "easier."

6.
The trial court erred in denying defendants' Motion to Supplement the Record and Motion for New Trial whereas Youn was permitted to offer post-trial evidence to prove both liability and damages, and the evidence offered by defendants was intended to prevent the perpetration of a fraud on the court.

7.
The trial court erred in assessing liability against MOC because it was not the owner or operator of the M/T ATLANTIA, and was not Youn's employer.

8.
The trial court's award of general damages in the amount of $1,400,000.00 is excessive. The award should be substantially reduced or set aside and a new trial ordered.

9.
The trial court erred in awarding prejudgment interest as to the entire damage award since a substantial portion of the award represents future losses for which interest would not have accrued.

10.
The evidence does not support the trial court's award for future medical expenses in the amount of $40,000.00.

11.
The evidence does not support the trial court's award for past loss of earnings in the amount of $22,642.00.

12.
The evidence does not support the trial court's award of past and future loss of "found" in the amount of $41,222.00.

ISSUES: GARD
GARD alleges as error the following:

*193 1.
The trial court erred in not dismissing the petition, as amended, for want of subject matter jurisdiction, plaintiff having designated his claims as purely admiralty or maritime claims of which federal district courts have exclusive jurisdiction.

2.
The trial court erred in denying the defendants their substantive federal right to trial by jury of Jones Act and general maritime law claims.

3.
The trial court erred in not maintaining GARD's exception of no cause of action or no right of action against it under the Louisiana Direct Action Statute, La.R.S. 22:655, or otherwise.

4.
With plaintiff not having met his burden of proving any insurance coverage and the terms and provisions of any such coverage, the trial court erred in rendering judgment against GARD.

5.
The trial court erred in denying GARD's motion for continuance of the trial.
We shall consider GARD's assignments of error later in logical sequence, but first we shall consider the assignments of error by both Atlantia and MOC in convenient groups as follows:

TRIAL BY JURY/SUBJECT MATTER JURISDICTION
Defendants, Atlantia and MOC, as well as defendant GARD, first argue that the trial court action in striking MOC and Atlantia's request for a jury was error. They also agree and urge that a plaintiff's designation of his suit as admiralty or maritime under C.C.P. art. 1732(6) impermissibly usurps jurisdiction of admiralty cases from the federal courts. Finally, it is alleged that C.C.P. art. 1732(6) is unconstitutional in that it operates to deprive a defendant his right to trial by jury.
In response to plaintiff's original petition, Atlantia in its answer, requested trial by jury. Plaintiff then filed a first supplemental and amending petition, in which he clarified his position that he was filing suit both under the Jones Act and under General Maritime Law and further stated that "Plaintiff specifically designates this suit as an admiralty or general maritime claim for purposes of eliminating any right to trial by jury in accordance with 1732(6) of the Louisiana Code of Civil Procedure."
Plaintiff next filed a second amended petition which again stated that his claim was a general maritime claim and therefore defendants had no right to a jury trial under LSA-C.C.P. art. 1732(6).
MOC then filed its answer, and also requested a jury trial therein.
Plaintiff filed a motion to strike defendant's jury demands which was granted by the trial court. MOC and Atlantia applied for supervisory writs to this Court. Writs were refused.
Defendant's application for a review of our decision was quickly filed with the Louisiana Supreme Court who also refused writs. Hae Woo Youn v. Maritime Overseas Corporation, 559 So.2d 1367 (La. 1990). Thus, our decision was, in effect, affirmed by the Supreme Court.
Immediately before trial, GARD filed a removal notice alleging that plaintiff's election to proceed under general maritime law operated to divest the trial court of jurisdiction. Federal District Judge Sear of the Eastern District of Louisiana found no merit to defendant's argument as it remanded the case back to state court before the state court trial began.
Youn asserts that the decisions of this court and the Louisiana Supreme Court, denying defendant's supervisory relief should be considered "law of the case," precluding further consideration of these issues.
The Louisiana Supreme Court explained the principle of "law of the case" in Day v. Campbell-Grosjean Roofing & Sh. Metal Corp., 260 La. 325, 256 So.2d 105, 107 (1971):
With regard to an appellate court, the `law of the case' refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the *194 same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of matter at issue. [Footnotes omitted].
The "law of the case" principle applies to all decisions of an appellate court, not merely those arising from the full appeal process. Mihalopoulos v. Westwind Africa Line, Ltd., 511 So.2d 771 (La.App. 5 Cir.1987); City of New Orleans v. Rasmussen, 542 So.2d 13 (La.App. 4 Cir.1989), writ denied, 548 So.2d 334 (La.1989).
Ordinarily, we would decline to reconsider this issue pursuant to the principle of "law of the case." However, in this instance, we note that GARD was not a party to the suit at the time the issue was raised by writs to this Court and the Louisiana Supreme Court. The principle of "law of the case" is to be applied only against those who were parties to the cases when the former appellate decision was rendered and who thus had their day in court. Gaudet v. G.D.C., Inc., 477 So.2d 731 (La.App. 1 Cir.1985); Day v. Campbell-Grosjean Roofing & Sh. Metal Corp., supra.
Accordingly, we will consider these issues again in this appeal.
LSA-C.C.P. art. 1732(6) provides that a trial by jury shall not be available in:
A suit on an admiralty or general maritime claim under federal law that is brought in state court under a federal `saving to suitors' clause, if the plaintiff has designated that suit as an admiralty or general maritime claim.
Defendants' first allegation, that the trial court erred in striking their request for jury trial, was found meritless in Heinhuis v. Venture Associates, Inc., 558 So.2d 1244 (La.App. 1 Cir.1990), writ denied, 559 So.2d 1369 and 1385 (La.1990), wherein the court held that, pursuant to C.C.P. art. 1732(6), the option of whether or not to have a jury trial rests solely with the plaintiff. Furthermore, plaintiff's cumulation of his Jones Act claim with an admiralty or general maritime claim does not open the door for the defendant Jones Act employer to demand a jury trial.
At the time of oral argument in November, 1991, Heinhuis was the only positive ruling on this issue, although there was a case from the Fourth Circuit, Gauchet v. Chevron USA Inc., 541 So.2d 272 (La.App. 4 Cir.1989), which expressed a contrary sentiment in dictaand at that time, we chose to follow the Heinhuis ruling as the more correct interpretation. Since that time, however, on May 26, 1992, the Louisiana Supreme Court has settled the matter with finality by holding, on rehearing, that Jones Act claims are admiralty and maritime claims and that, pursuant to LSA-C.C.P. art. 1732(6), the plaintiff alone had the right to elect whether his case would be decided by a jury or by the trial court. Parker v. Rowan Companies, Inc., 599 So.2d 296 (La.1992).
In Sons v. Inland Marine Service, Inc., 577 So.2d 225 (La.App. 1 Cir.1991), the First Circuit rejected defendants second argument, that the legislature, in its enactment of C.C.P. art. 1732(6), supra, prohibiting jury trials in admiralty or general maritime cases, attempted to usurp jurisdiction of admiralty cases from the federal courts, contrary to the United States Constitution. In rejecting this argument, the First Circuit stated that:
... the article does not impermissibly usurp jurisdiction of admiralty cases because state courts already have concurrent jurisdiction over in personam admiralty actions. Nothing in the article seeks to establish jurisdiction over in rem admiralty suits, which are exclusively within the jurisdiction of federal courts. Therefore, defendants' first argument has not merit. At p. 229. [Emphasis partially ours].
Defendants' position was also rejected by the Eastern District of Louisiana in Bergeron v. Quality Shipyards, 765 F.Supp. *195 321, 323 (E.D.La.1991), wherein the court said:
Second, we are at a loss, from either a logical or legal perspective, as to how the invocation of a state procedural rule which limits the availability of a jury trial in a state court proceeding, confers upon this court exclusive federal admiralty jurisdiction. It is well established that state courts have concurrent jurisdiction to try in personam admiralty actions. [Citations omitted].
Defendants next argue that the trial court's action in striking their demand for trial by jury violated their constitutional rights under the Supremacy Clause and the Equal Protection Clause of the United States Constitution.
In Sons, supra, this same argument was rejected:
Defendants contend the trial court's denial of their request for a trial by jury denies them due process, equal protection of the laws, and equal access to the courts in violation of the United States and Louisiana Constitutions. However, the United States Supreme Court has held that the Seventh Amendment right to jury trials in civil cases is not so fundamental to the American system of justice as to be required of state courts by the due process clause of the Fourteenth Amendment. See Melancon v. McKeithen, 345 F.Supp. 1025, 1035 (E.D.La.1972), affirmed, 409 U.S. 943, 1098, 93 S.Ct. 289, 908, 34 L.Ed.2d 214, 679 (1973); Rudolph v. Massachusetts Bay Insurance Co., 472 So.2d 901 (La. 1985). The denial of a jury trial in a state civil proceeding also does not violate the equal protection clause of the United States Constitution. Letendre v. Fugate, 701 F.2d 1093 (4th Cir.1983).
In addition, there is no due process right to a jury trial in civil cases under the Louisiana Constitution of 1974. See Fidelity & Guaranty Insurance Company v. Succession of Smith, 525 So.2d 348, 353 n. 3 (La.App. 1st Cir.1988). At page 229.
The court then noted that the state had legitimate interests in enacting LSA-C.C.P. art. 1732(6), first to make the procedure in state admiralty cases consistent with the procedure in the federal court system, where a plaintiff may also designate his claim as an admiralty or general maritime claim to preclude defendant from having a jury trial, (see F.R.C.P. 9(h) and Romero v. Bethlehem Steel Corporation, 515 F.2d 1249 (5th Cir.1975), and second to minimize the delays and greater court costs which generally attend jury trials. Sons, supra and Heinhuis, supra.
Finally, the court noted that the denial of a jury trial does not operate to deny defendants access to the courts as "they still will have an adequate opportunity to defend themselves before an impartial trier of fact." At page 230.
Accordingly, these assignments of error are rejected.

LIABILITY FOR PLAINTIFF'S INJURIES
Atlantia and MOC allege that the trial court erred in finding them 100% liable to plaintiff under the theories of unseaworthy and negligence.
Initially, we note that the Louisiana Supreme Court has set down instructions very emphatically, and on several occasions, relative to the findings of fact made by the trial court, as enunciated in Rosell v. Esco, 549 So.2d 840 (La.1989) (and other cases) and more recently, and more positively, in Martin v. East Jefferson General Hospital, et al., 582 So.2d 1272 (La.1991), and we acknowledge that appellate courts are bound to abide by same. In Martin, the Supreme Court stated:
... `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We have instructed the appellate courts that when there are two permissible views of the evidence, the factfinder's choice between *196 them cannot be manifestly erroneous or clearly wrong. [Emphasis added].
Additionally, in Sutton v. Central Gulf Lines, Inc., 433 So.2d 888, 891 (La.App. 5 Cir.1983), this Court examined the scope of review applicable in an admiralty case (Jones Act):
Initially, we acknowledge that while we enjoy full constitutional authority to review both the law and facts in civil cases; nevertheless, under federal law and jurisprudence, the findings of the trial judge on the merits may not be disturbed unless they are clearly erroneous. Jones Act, 46 U.S.C.A. Section 688; Federal Rule of Civil Procedure, Rule 52(a); Cooper v. Keyes Offshore, Inc., 421 So.2d 385 (La.App. 1 Cir.1982); Portier v. Texaco, Inc., 426 So.2d 623 (La.App. 1 Cir. 1982). The courts in Cooper, supra, and Portier, supra, both looked to the United States Supreme Court for an explanation of the `clearly erroneous' rule and in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), found the following:
A finding is clearly erroneous when `although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' 348 U.S. at 20, 75 S.Ct. at 7.
The trial court made findings of fact as follows:
The accident happened because the boat was in an unseaworthy condition, and because of negligence. The winch control lever had been broken for some period of time and did not operate. Accepting the testimony in the light most favorable to the defendants, the Court finds that the winch lever was dysfunctional. Furthermore, the lever could easily and should easily have been repaired during the six months that it was broken while the boat was in American waters. The crew was non-trained. The Court is impressed by the testimony of all crew members that there were no safety manuals written in Korean, that there was no training provided for any crew members, and that the procedure of MOC as to hire the Korean crew member and put him on the boat. On-the-job training can be expected to lead to accidents. Defendants were negligent. They allowed the crew to use the steam valve because the winch lever did not work. The Court finds that the use of the steam valve is not a safe method, and is not the method intended in the design of the ship for the use of the winch. Mr. Heu released too much steam, accelerating the speed of the winch, leading to the accident. The negligence of a crew member in employing a method approved by his employer is actionable. Choi was ordered to engage the crane reel stopper in the event that the winch control lever began to operate out of control. Choi, because he was afraid, and was being peppered by debris coming off the cable, ran from his post. This placed Bosun Youn in the predicament of having no stopper. At the time that Choi abandons his post, the winch is out of control, Heu has over-accelerated the steam, and the crane boom is beginning to fall. Youn attempts to take action to preserve his employer's property and to save the lives of his fellow workers. The winch cable snaps Youn's leg, creating his injury.
The Court resolves this as a simple matter. The Court finds that there is gross negligence in regard to the failure of MOC and Atlantia to provide a seaworthy vessel, and to repair a known broken piece of equipment. The burden of the plaintiff is light. A vessel owner/employer is deemed negligent if it fails to exercise reasonable care to maintain a reasonably safe work environment. In this case, the evidence overwhelmingly preponderates in favor of plaintiff and against defendant.
The Court finds as a fact, that the crew was not properly trained in the operation of the winch. The Court finds as a fact, that there was no training to the crew as to what action to take in the event the winch became out of control as occurred here, and further, that because the vessel owner failed to repair the broken winch, or to employ an automatic *197 stopper, it was foreseeable that an event such as this would occur. The court finds that at no time, did any superior member of the Atlantia crew, or MOC Corporation, require Youn or anyone else to use any alternative method in winding the winch.
Defendants argue that the use of the gypsy head to wind the excess cable onto the winch drum, would avoid the accident. The defendants suggest that all slack between the crane reel and winch drum should be taken in. The Court was impressed by the fact that the actions taken by Youn appeared to be commonplace, and further that the captain of the boat had no knowledge as to what methodology was correct. The captain admits that they were in a substantial hurry because the pilot had come to move the boat and that it was Youn's job to get the crane in a position to shove off. Youn testified and his crew members support the idea, that the method he was using was the most efficient, and that they had never been instructed to avoid that method nor of any safety hazards created by the method.
The Court is not impressed by the defendants' efforts to blame the accident on Youn's use of the method employed by him, instead of their failure to train their crew, and to repair their broken equipment which they provided to Youn.
The Court is not impressed by the claim that Youn used a `shortcut' in view of the Captain's testimony that they were in a hurry to take off, and all witnesses' testimony that Youn was an experienced, knowledgeable bosun. The Court finds that had the winch been repaired, or had the untrained crew members stayed at their post, or had the steam valve not been overcharged, the accident would have been avoided. All this is directly placed at the feet of the defendants. Furthermore, from reviewing the evidence, including the photographs, the Court does not believe that it would be practical or probable, that all of the line could be placed on the gypsy head.
* * * * * *
The Court does not find Mr. Youn contributorily negligent. He acted in accordance with his training, he was given inadequately trained helpers, one of whom abandoned his post, and he was required to work with defective equipment. The Court is well aware of the pressure placed upon a foreign seaman to do the job required, and the inability of a seaman to refuse his duties. The Court further notes the substantial conflicts in the testimony of the crew between their discovery depositions taken by the plaintiff and their trial depositions several days later. The Court recognizes in those depositions that the crew members were kept under the total control of the defendants, that certain relevant crew members were present in New Orleans in order to provide information to defense counsel, and at least one was then sent to Tokyo rather than provided for testimony. The record reflects that Port Captain Williams made an inspection of the vessel right after the accident, and condemned the actions of the crew and recognized the failure of the equipment. This information was not provided to plaintiff until the eve of trial, and then only inadvertently. The Court, in evaluating the evidence, believes the statements of the crew members taken in the discovery depositions, believes the statements of Captain Williams in his June inspection report, accepts the testimony of Captain George Blann as more reasonable based on facts and evaluations consistent with accepted maritime safety practices, and finds evidence in favor of Youn on the issues of unseaworthiness, negligence, and lack of comparative negligence overwhelming.
A careful review of the entire record and particularly the conclusions stated above have convinced us these findings of fact are reasonable and are abundantly sufficient to find liability in tort and under general maritime law on the part of Atlantaia and MOC. Accordingly, we find no manifest error in the findings of fact and conclusions reached by the trial court.

*198 CLAIMS UNDER (1) THE JONES ACT AND (2) UNSEAWORTHINESS
The claims of negligence under the Jones Act and because of unseaworthiness are separate and distinct claims. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).
Under general maritime law, a shipowner has an absolute duty to provide the members of his crew with a seaworthy vessel. A ship is unseaworthy unless it and all of its appurtenances and crew are reasonably fit and safe for their intended purpose. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989), affirmed, Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The duty of a shipowner to provide a seaworthy vessel is absolute; actual or constructive knowledge by the owner of the unseaworthy condition is not necessary to support liability. In addition, a showing of due diligence or lack of negligence by the owner will not negate liability. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). To prevail on an unseaworthiness claim, a plaintiff must show that the vessel was unseaworthy and that the unseaworthy condition was the proximate cause of his injury. Alverez v. J. Ray McDermott & Co., 674 F.2d 1037 (5th Cir.1982).
Under the Jones Act, a vessel owner is deemed negligent if he fails to exercise reasonable care to maintain a reasonably safe work environment. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982).
The trial court found that the winch control lever was broken, and therefore the crew had to use the steam valve to control the winch. The seaman using the steam valve released too much steam, accelerating the speed of the winch and causing the accident. The trial court also found that the crew was non-trained, and that this was a fault or negligence assignable to the defendants and that this also contributed to the accident.
We see no manifest error in the trial court's judgment finding that the vessel was unseaworthy and that Atlantia and MOC were negligent in failing to provide to plaintiff a safe place to work.
Atlantia and MOC agree upon and urge that plaintiff was comparatively negligent in using the "line unattached" instead of the "line attached method."
In Ceja, supra at 1194, the court said:
Generally, a seaman has no duty to find the safest way to perform his work. Comeaux v. T.L. James & Co., supra, 666 F.2d [294] at 300 [5th Cir.1982]; Spinks v. Chevron Oil Co., 507 F.2d 216, 223 (5th Cir.1975), clarified, 546 F.2d 675 (5th Cir.1977) (`His duty is to do the work assigned, not to find the safest method of work'). Rather, the duty to provide for a safe course of conduct lies primarily with the vessel owner. A seaman, therefore, is not contributorily negligent merely because he uses an unsafe tool or appliance or proceeds in an unsafe area of the ship. Only where it is shown that there existed a safe alternative available to him of which he knew or should have known, can a seaman's choice of an unsafe course of action be properly considered in determining whether he was negligent. Accord Joyce v. Atlantic Richfield Co., 651 F.2d 676, 682-83 (10th Cir. 1981). [Emphasis partially ours]. [Footnotes omitted].
The trial court found that the "line unattached" method utilized by Youn was sanctioned by the defendants, that this method was commonplace and was the most efficient method to raise the gangplank. The court further found that, from the evidence, use of the "line attached" method was not practical or probable with regard to plaintiff's tasks at the time of the accident.
We see no error in the trial court's decision finding that plaintiff was not comparatively negligent.
Finally, defendants argue that the trial court erred in disregarding OSHA regulations in its determination of plaintiff's standard of care. We see nothing in the record which shows that plaintiff was aware of the OSHA regulation which indicates that the "line attached method" is *199 safer nor do we find anything to show that defendant's training, if any, of plaintiff included teaching plaintiff OSHA regulations. Furthermore, in light of the court's finding that using the "line attached method" was neither probable nor practical in this case, the trial court's consideration of the OSHA safety regulation would not change the outcome of this case.

TRIAL COURT'S DENIAL OF INTRODUCTION OF POST-TRIAL EVIDENCE AND/OR MOTION FOR NEW TRIAL.
After the conclusion of the trial, MOC and Atlantia sought to have introduced into evidence a videotape demonstrating how to raise and lower the boom using the portside winch on the M/T Atlantia. Defendants also filed a motion for new trial alleging that this tape constituted newly discovered evidence.
We find that the trial court did not err in denying the introduction of the videotape into evidence one month after the conclusion of trial.
The videotape is experimental evidence attempting to refute plaintiff's expert's testimony that there was too much line on the portside winch which made using the "line attached" procedure unsafe and/or impossible. Before such evidence can be considered at trial a proper foundation for its admissibility must be established. There is ample jurisprudence holding that to establish a proper foundation the offering party must affirmatively show that the experiment was conducted under similar, if not precise, conditions as were present during the original act. Hunnicutt v. Kent, 434 So.2d 91 (La.App. 5 Cir. 1982), writ denied, 435 So.2d 442 (La. 1983); Guidry v. Boston Old Colony Ins. Co., 540 So.2d 543 (La.App. 3 Cir.), writ denied, 543 So.2d 7 (La.1989). No such showing was made in this case.
MOC and Atlantia alternatively allege that the videotape was "newly discovered" evidence and therefore the trial court erred in not granting their motion for new trial.
LSA-C.C.P. art. 1972 provides:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
To obtain a new trial on the basis of newly discovered evidence there must be a clear showing not only that the evidence was discovered after trial, but that every reasonable and diligent effort was made to procure it before trial. LeBlanc v. Consolidated Aluminum Co., 401 So.2d 1082 (La. App. 3 Cir.), writ denied, 409 So.2d 617 (La.1981).
Defendants argue that they did not become aware of plaintiff's expert's opinion until September 12, 1990, sixteen days before trial and that at that time they began efforts to board the M/V Atlantia. The ship did not enter the United States until September 24, 1990; and then it had to be moved several times. The videotape was made on September 28, 1990 (the same day the trial began) and defendants received it October 1, 1990 one week after trial. However, defendants did not seek to have the tape introduced into evidence until November 2, 1990a delay of over four weeks.
From the record before us, we find that defendants have not borne their burden of showing that the videotape was "newly discovered" evidence and therefore are not entitled to a new trial. Defendants had full knowledge that the tape was being made on the day of trial. However, they withheld this important information from the court and opposing counsel and they made no attempt to have the trial judge hold the case open until the tape could be viewed and offered into evidence.
Furthermore, although defendants received the tape on October 1st, they waited over a month to seek its introduction into *200 evidence. Under all these circumstances, we see no abuse of discretion whatsoever in the trial court's ruling denying defendant's motion for new trial.
Although this Court allowed defendants to supplement their brief with a copy of the videotape out of an abundance of caution to insure fairness, we decline to examine the videotape since it was not introduced into evidence at trial. Uniform Rules of CourtCourts of AppealRule 1-3. Coleman E. Adler & Sons, Inc. v. Waggoner, 538 So.2d 1131 (La.App. 5 Cir.1989).

LIABILITY OF MOC
Under both general maritime law and the Jones Act, the employer of the seamen and the vessel owner may be liable for negligent injury or death, or injury or death resulting from the unseaworthiness of the vessel. Symeonides v. Cosmar Compania Naviera, S.A., 433 So.2d 281 (La.App. 1 Cir.), writ denied, 440 So.2d 731 (La.1983), cert. denied, Cosmar Compania Naviera, S.A. v. Symeon Symeonides, 465 U.S. 1079, 104 S.Ct. 1442, 79 L.Ed.2d 762 (1984).
MOC alleges that it does not own or operate the M/T Atlantia and was not the employer of plaintiff, and therefore, the trial court erred in holding MOC liable under general maritime law or under the Jones Act.
We are aware that only an employer can be liable under the Jones Act. Karvelis v. Constellation Lines S.A., 806 F.2d 49 (2nd Cir.1986), cert. denied, Constellation Lines S.A. v. Karvelis, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). However, for the purposes of recovery, it may be possible for a seaman to have more than one Jones Act employer. Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447 (5th Cir.1980). In determining who is an employer for recovery under the Jones Act, "control" is the critical inquiry:
Factors indicating control over an employee include payment, direction, and supervision of the employee. Also relevant is the source of the power to hire and fire. The control which is exercised must be substantial; the mere possibility of some control over the actions of an employee will not suffice to find an employer-employee relationship.
Volyrakis v. M/V Isabelle, 668 F.2d 863, 866 (5th Cir.1982).
We find here that MOC was an employer under the Jones Act for the following reasons.
The record in this case establishes that all of the crew members of M/V Atlantia who testified, including plaintiff, stated that MOC was their employer. Port Captain Williams also testified that the crew of the M/V Atlantia were working "indirectly" for MOC. Donald Farmer of MOC testified that MOC was responsible for "crewing" the vessel and for attending to all crew matters. The contract between MOC and Atlantia gave MOC "sole and exclusive management ... of the said vessel," including the power to hire and fire crew, prepare payroll and otherwise conduct all business of the vesselnothing could be more clear. Furthermore, the reports of plaintiff's injury were sent to MOC. In view of the above facts, we see no manifest error in the trial court's finding that MOC was plaintiff's employer.
Although both plaintiff and defendants argue the ownership status of MOC, the trial court made no finding regarding MOC's status as owner pro hac vice of the M/V Atlantia. Because we find plaintiff can recover damages from MOC, under the Jones Act, the issue of whether MOC is also owner, pro hac vice,[1] of an unseaworthy vessel is academic and need not be addressed. McFarland v. Justiss Oil Co. Inc., 526 So.2d 1206 (La.App. 3 Cir.1988).

*201 DAMAGES
The trial court awarded damages to Hae Woo Youn as follows:

 1. Medical expenses, future $ 40,000.00
 2. Past loss of net earnings $ 22,642.00
 3. Future loss of net earnings $ 200,000.00
 4. Past loss of found $ 3,748.00
 5. Future loss of found $ 37,474.00
 6. Past physical pain and suffering $ 200,000.00
 7. Future physical pain and suffering $ 300,000.00
 8. Past mental anguish and loss of enjoyment of life $ 200,000.00
 9. Future mental anguish and loss of enjoyment of life $ 300,000.00
10. Disability and disfigurement $ 400,000.00
 _____________
 TOTAL $1,703,864.00

MOC and Atlantia presents several allegations of the excessiveness of these awards.
First, defendants allege that the trial court erred in awarding $1.4 million in general damages.
In Sutton v. Central Gulf Lines, Inc., supra, this Court set down the guidelines to review damage awards in a Jones Act case:
In reviewing damages awarded to injured seamen under the Jones Act, such awards will not be disturbed unless they are so large as to shock the judicial conscience or indicate bias, passion, prejudice, corruption or any other improper notice. Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir.1980). Further, in non-jury actions, the trial court's determination of damages is reviewable only for abuse of discretion, subject to being set aside as a finding of fact under the `clearly erroneous' standard of Rule 52(a) of the Federal Rules of Civil Procedure. Smith v. Manausa, 535 F.2d 353 (6th Cir.1976). As to excessive awards, each case must be determined on its own facts and comparing damage verdicts rendered in different cases is not a satisfactory method for determining excessiveness in a particular case. Allen, 623 F.2d at 364 (Quoting Wiley v. Stensaker Schiffahrtsges, 557 F.2d 1168, 1172 (5th Cir.1977).
However, if an abuse of discretion is found, then this Court may resort to prior awards in comparable cases for guidance in fixing the appropriate award. The award may be lowered (or raised) to the highest (or lowest) point which is reasonably within the trial court's discretion. Tracy v. Jefferson Parish, 523 So.2d 266 (La.App. 5 Cir.), writ denied, 530 So.2d 569 (La.1988); Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App. 2 Cir.1989).
Youn's injury consisted of a severe lacerations of the femoral artery and femoral vein in his left leg and severed main artery and vein in the lower part of the leg, requiring that both the artery and vein be replaced and reconstructed. Youn initially spent five weeks and underwent five surgeries at Our Lady of the Lake Hospital in East Baton Rouge. Eventually, two-thirds of his quadriaps muscle was removed. During his hospital stay, Youn was in great and sustained pain requiring heavy sedation. He was also fearful that his leg would have to be amputated.
After his return to Korea, Youn ruptured the hamstring muscle which required surgical repair. The condition of Youn's leg as a result of the accident prevented the hamstring *202 muscle from healing normally, thus causing additional damage.
Youn currently has between a 30-35% disability of the left lower extremity, which translates to a 14% total disability rating of the entire body. The leg is void of muscle mass, and consists of only bone, artery and skin. His left leg is considerably thinner than his right and is covered with scars from groin to foot. However, plaintiff is able to walk without crutches or other aid, but he walks with a moderate limp. He currently takes pain medication on an occasional basis. Youn cannot stand for extended periods of time and will never be able to do heavy work. In addition, Youn may have to undergo further surgery in the future. Youn also stated that the appearance of his leg has caused him anxiety, embarrassment and pain and has caused marital difficulties.
Even though Youn's injuries are undoubtedly severe, and permanent in some respects, we find that in certain areas, the trial court abused its discretion (on the high side) in awarding damages of 1.4 million dollars. Accordingly, we turn to comparable cases to determine the highest amount the trial court could have reasonably awarded in this case.
In Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3 Cir.), writ denied, 565 So.2d 450 (La.1990), plaintiff suffered injuries to both legs as a result of an automobile accident. Plaintiff was initially hospitalized for over three months during which time three surgeries were performed. After his release, he underwent two more surgeries, and his doctor predicted that he would need one more operation. Plaintiff was partially disabled, with a 15% functional impairment to his left leg and a 5% functional impairment to his right leg. He could not do prolonged walking or manual labor. Plaintiff also suffered from back pain due to his unnatural walking gait. The trial court awarded damages of $250,000.00. On appeal, the court increased plaintiff's award of general and special damages to $450,000.00.
In Peterson v. Western World, 536 So.2d 639 (La.App. 1 Cir.1988), writ denied, 541 So.2d 858 (La.1989), the 39 year old plaintiff fell fifteen to twenty feet off a structure and sustained a severe compression fracture of the right ankle, a fracture of the left heel and a compression fracture of the spine. Plaintiff was hospitalized for one week following surgery where two inch screws were implanted in his right ankle. Plaintiff was then bedridden for three weeks, wheelchair bound for a few weeks and then walked with crutches for two three weeks. During his first few weeks, plaintiff's pain was so great he could not talk on the phone. Plaintiff underwent a second unsuccessful operation to remove the screws from his ankle. At the time of trial, plaintiff had a 25 to 40% permanent partial disability, was expected to undergo at least one more surgical procedure, was unable to continue working or participate in recreational sporting activities. On appeal, the court affirmed a general damage award of $400,000.00.
In LeBleu v. Dynamic Indus. Constructors, 526 So.2d 1184 (La.App. 3 Cir.), writ denied, 528 So.2d 154 (La.1988), plaintiff's right ankle was fractured in a construction accident (plaintiff had lost his left leg in a prior hunting accident). After surgery, complications arose and plaintiff could not use the ankle at the time of trial. Plaintiff was totally disabled, could walk only short distances with extreme effort and could no longer enjoy recreational activities. Plaintiff also developed traumatic neurosis. On appeal the trial court affirmed a general damage award of $300,000.00.
In Snyder v. Taylor, 523 So.2d 1348, 1355-56 (La.App. 2 Cir.), writ denied, 531 So.2d 267, 268 (La.1988), plaintiff was involved in an automobile accident. His injuries were, in our opinion, similar in severity in many respects to those suffered by the plaintiff here:
Plaintiff suffered multiple and severe injuries. He was unconscious in the highway for 40-45 minutes before an ambulance arrived. The witness Curtis said that before the ambulance arrived he observed that
The bone was sticking out of [plaintiff's] left thigh. His knee was turned *203 around almost touching his left buttock area. His right foot was turned completely around, and his ankle bone was sticking through his sock.
Curtis said that plaintiff was screaming as he held him down and covered him with a blanket.
Plaintiff, his wife, and experts testified about the past and present extent of his injuries and disabilities. Depositions of Dr. Bailey and Dr. Moyer, the orthopedic surgeons who treated plaintiff, were introduced. Dr. Bailey said:
He had an obvious open fracture of the left femur, or the thighbone, between the knee and the hip, that the bone was broken and out through the skin. * * *
He had a closed, or a fracture without protrusion of the bone through the skin of the same leg below the knee, with obvious deformity and swelling in that area, and an obvious fracture that was out of line. [Both bones below the knee were broken.] * * *
He had a dislocation of the right ankle, again open with the entire lower tibia, or shinbone, and the top of the ankle exiting, or stuck out, through the skin, also. * * *
[The right foot] was attached, but was rotated about 130 degrees ... He had no pulse in his foot.
Dr. Bailey stated that the repair of plaintiff's right ankle and foot and left leg required several surgeries in which plates and pins were inserted and bone grafts were performed.
Although the most serious injuries suffered by plaintiff were those to his lower extremities, plaintiff also suffered a broken and lacerated nose, a lacerated eyelid, a lacerated lip, a severely lacerated left forearm, and broken and disaligned teeth.
Also in Snyder:
Plaintiff underwent nine separate surgical procedures.
Dr. Bailey expected plaintiff to suffer continued pain in his right ankle and weakness in his left leg due to arterial injuries.
Dr. Moyer stated that plaintiff has restricted motion of 20 percent in his right ankle and that the left tibia (lower leg) is bowed or malaligned. Dr. Moyer believed that the likelihood of a degenerative process of the left knee was `very, very good' due to the malalignment in the left leg. He recommended that plaintiff refrain from any activity that would put pressure on his legs and suggested swimming or bike riding for physical activities.
Plaintiff testified at trial almost six years after the accident. He said he continues to suffer pain and stiffness in his right ankle, numbness in his left leg, lower back pain and stomach problems due to the extensive medication he has taken since the accident.
Plaintiff, a healthy 28-year-old engineer in 1980, was physically active and enjoyed jogging and snow skiing before the accident. He has since been unable to engage in such activities.
Plaintiff suffered what was described as severe pain, especially in the hours and days immediately following the accident. He was hospitalized more than 30 days. He was in the early stages of a career which required physical exertion. Plaintiff is forever prevented from participating in many of the previous physical activities he enjoyed and continues to suffer pain with substantial prospects for further degenerative problems.
Plaintiff's physical injuries are comparable to those suffered by the young plaintiff in Klein v. Himbert, 474 So.2d 513 (La.App. 4 Cir.1985), who was awarded $300,000 in general damages. Unlike the plaintiff Klein, supra, plaintiff's disabilities also prevent him from being a physically active civil engineer, a career for which he was educated and trained.
The appellate court found no abuse of discretion in the trial court's award of $325,000.00.
In Simeon v. T. Smith & Sons, Inc., 852 F.2d 1421 (5th Cir.1988), cert denied, T. Smith & Sons, Inc. v. Simeon, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), plaintiff's foot was nearly severed *204 from his ankle. He was hospitalized for two months and underwent a series of operations. At the time of trial, plaintiff could only walk short distances, had to use a cane and was unable to return to work. He was depressed and was experiencing marital difficulties. After trial, the jury returned a verdict with a general award of damages of $1,250,000.00. The trial court ordered a remittitur of $750,000.00. On appeal, the court further reduced the award, awarding general damages of $600,000.00. In reaching this figure, the court examined eight cases involving comparable injuries, which contained various awards of general damages ranging from $75,000.00 to $500,000.00.
Comparing the facts in the above case and the various awards with the facts and the award in the present case for total damages we find that a total of $600,000.00 is the maximum amount the trial court could have reasonably awarded and accordingly, we find that the awards of damages must be reduced in this case.
We are aware that the comparable awards discussed are all for "general" damages which would include past and future physical pain, past and future mental anguish and loss of enjoyment of life and disability and disfigurement. However, in the case sub judice, we find it necessary to break down the award into categories (as did the trial court) because of the necessity under admiralty law to exclude pre-judgment interest on future, unaccrued non-economic damages; see discussion, infra.
Accordingly, we partition the award of general damages as follows:[2]

TOTAL $600,000.00
Past Physical Pain and Suffering 85,800.00
Future Physical Pain and Suffering 128,400.00
Past Mental Anguish and Loss of Enjoyment of Life 85,800.00
Future Mental Anguish and Loss of Enjoyment of Life 128,400.00
Disability and Disfigurement 171,600.00
Past 68,640.00
Present and Future Damages 102,960.00

PRE-JUDGMENT INTEREST
Atlantia and MOC allege that the trial court erred in awarding pre-judgment interest on the damage award for future losses. When a case is brought under the general maritime law as well as a Jones Act claim, tried before a judge, award of pre-judgment interest lies within the trial court's discretion. Mihalopoulos v. Westwind Africa Line, Ltd., supra; Williams v. Reading and Bates Drilling Co., 750 F.2d 487 (5th Cir.1985).
However, while the trial court generally has discretion to award pre-judgment interest on most damage awards, pre-judgment interest is not awardable on future, unaccrued damages. Boyle v. Pool Offshore Co., a Div. of Enserch Corp., 893 F.2d 713 (5th Cir.1990); Spangler v. North Star Drilling Co., supra.
Accordingly, we further amend the judgment to reflect that plaintiff is entitled to pre-judgment interest on awards for damages except those for future damages. Plaintiff is entitled to interest from date of judgment on those amounts.

FUTURE MEDICAL EXPENSES
In order to recover for future medical expenses, a plaintiff must prove that it is more probable than not that such expenses *205 will be undertaken and incurred. Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 4 Cir.1990), writ denied, 569 So.2d 965 (La.1990).
Dr. Davis, one of plaintiff's initial treating physicians, testified that the estimated longevity of a vascular graft was 10 years, therefore, it was more probable than not that plaintiff would have to undergo surgery within ten years. Plaintiff's life expectancy from date of trial was 33.8 years; therefore, it is more probable than not that plaintiff will be required to undergo more than one surgical procedure. Dr. Davis testified further that the present cost of such surgical procedure is $10,000.00. Dr. Davis also stated that plaintiff should see a vascular surgeon for an examination once a year.
Dr. Martin Bell, another treating physician, testified that he recommended reconstruction surgery for plaintiff's thigh, which would currently cost $23,500 to $42,000.
Plaintiff testified that he presently did not wish to undergo surgery, however, Dr. Davis testified in effect, that his physical condition would decline to the point in the future where he would be required to undergo surgery.
Considering the above testimony we see no abuse in the trial court's discretion awarding $40,000.00 for future medical expenses.

PAST LOST EARNINGS
Defendants allege that the trial court erred in awarding lost wages without taking into consideration that Youn was paid full wages from the date of the accident until October, 1989 and 60% of his wages from November, 1989 until the trial. Defendants argue that awarding plaintiff the full amount of wages to which he was entitled from date of accident to date of trial constitutes double recovery.
Plaintiff's argument in response is two-fold. First, he argues that defendants failed to affirmatively plead offset or credit as a defense and therefore cannot raise this issue on appeal. Second, plaintiff alleges that defendants were obligated to pay these amounts as maintenance and cure.
Affirmative defenses have been held to be:
... any response[s] by the defendant which raises new matter which `assuming the allegations of the petition to be true, constitutes a defense to the action which will have the effect of defeating the plaintiff's suit on the merits.' Langhans v. Hale, 345 So.2d 1226 (La.App. 1st Cir.1977), Modicut v. Bremer, 398 So.2d 570 (La.App. 1st Cir.1980), and Rourke v. Cloud, 398 So.2d 57 (La.App. 3rd Cir.1981).
Nolan v. Attwood, 484 So.2d 289, 292 (La. App. 3 Cir.1986).
The Third Circuit has also held that a claim of credit or payment is an affirmative defense which must be specifically pleaded and provided by the defendant. Galland v. Nat. Union Fire Ins. Co., 452 So.2d 397 (La.App. 3 Cir.1984). We are inclined to agree.
A review of the record shows that defendants did not raise offset or credit as a defense in any of their pleadings filed. However, in the case before us, defendants are not precluded from raising payment as a defense for the following reasons. At the trial, plaintiff stipulated that he was paid his wages, pursuant to union contract. Donald Farmer, MOC's Assistant Manager of the Crew Department, also testified that plaintiff was paid after the date of the accident pursuant to union contract. Objection was made by the defendants to the introduction of the union contract itself; however, there is no objection on the record to the evidence that plaintiff received payment from the date of injury to the date of trial.
C.C.P. art. 1154 provides:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even *206 after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
Accordingly, our view is that the pleadings in this case were enlarged to include the affirmative defense of setoff or credit by the introduction of evidence of payments to plaintiff without objection. In accord, see Sider v. Robin Temporary Service, 515 So.2d 1123 (La.App. 5 Cir.1987), writ denied, 519 So.2d 146 (La.1988) and Lacroix, Waring and Derbonne v. Anderson, 461 So.2d 1187 (La.App. 3 Cir. 1984), writ denied, 465 So.2d 735, 737 (La. 1985).
However, our view above is actually of no help to defendants because plaintiff argues that the payments he received were in the nature of "maintenance" and not lost wagesand we agreefor the following reasons.
In Ceja v. Mike Hooks, Inc., supra, the court held that maintenance payments could not be deducted from an award for past lost wages and it also defined "maintenance," as follows:
Appellant argues that the trial court erred in using the motive of preventing double recovery to offset the award of past lost wages with the amount of maintenance paid. On the basis of our recent decision, in Morel v. Sabine Towing & Transportation Co., 669 F.2d 345 (5th Cir.1982), we agree.
In Morel, appellant shipowner had appealed the district court's award of maintenance to an injured seaman during a period of compensated vacation. The Morel panel, viewing compensated vacation as a method of deferred wage payment and hence as `earned wages,' held that the district court's award of both damage elements was proper as wages were `separate and distinct from maintenance.' Id. at 347. The Court elaborated:
`Maintenance' is the equivalent of the food and lodging to which a seaman is entitled while at sea. Maintenance, and its necessary companion cure, are hallowed rights of seaman who are injured or become ill while in the service of a ship.... Maintenance is neither a substitute for wages nor is it to be considered in lieu of a seaman's wages, in whole or in part.

Id. at 346. We have concluded therefore, that absent an `explicit contractual provision specifying that ... wages [are] to be deemed a substitute for maintenance, there is no basis for crediting such earned wages against the vessel owner's maintenance obligation.' Id. (quoting Shaw v. Ohio River Co., 526 F.2d 193 (3d Cir.1975). [Footnotes omitted].
In the case sub judice, the union contract specifying plaintiff's terms of employment and rate of pay provided:

SICK PAY

SECTION 17
(i) When a Seafarer is discharged and hospitalized at any port outside of Korea, because of sickness or injury, the amount equivalent to his Basic Wage daily prorate shall be paid as the Sick Pay for the hospitalization period outside of Korea.
(ii) In case the sickness or injury is due to an accident arising out of and/or in the course of the Seafarer's employment, he shall be entitled to sick pay at a rate equivalent to his Basic Wage daily prorata during the medical attention for a maximum period of four (4) months from the date of his return to Korea, and when the sickness or injury has not been cured after the lapse of this four months, the Sick Pay shall be sixty (60) percent of his Basic Wage therefrom *207 until he is medically declared to have reached a maximum cure or to be incurable.
It is apparent that this provision sets forth a method to calculate the amount of "maintenance and cure" a seaman is entitled to; it does not state that wages are to be paid in lieu of maintenance. Therefore, because there is no express contractual provision specifying that wages are to be deemed a substitute for maintenance we find that the trial court did not err in awarding lost wages without a credit for sums paid to plaintiff from date of accident to date of trial as these latter sums constitute "maintenance and cure" and not wages. See Ceja, supra.

LOSS OF "FOUND"
Defendants assigns as error, the award for the "loss of found"[3] suffered by the plaintiff in the amount of $41,222.00. We agree.
In his reasons for judgment, the trial judge gave this rationale for this item of damages:
"The court finds that the plaintiff carried his burden of proof on the issue of `found' through testimony that the plaintiff was provided with clothing and meals everyday which would equate to at least $10.00 per day in value. The Court takes `judicial notice' of the costs of such matters."
LSA-C.E. 201 provides:
A. Scope of Article. This Article governs only judicial notice of adjudicative facts. An `adjudicative fact' is a fact normally determined by the trier of fact.
B. Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either:
(1) Generally known within the territorial jurisdiction of the trial court; or
(2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
C. When discretionary. A court may take judicial notice, whether requested or not.
D. When mandatory. A court shall take judicial notice upon request if supplied with the information necessary for the court to determine that there is no reasonable dispute as to the fact.
E. Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior opportunity to be heard, the request may be made after judicial notice has been taken.
F. Time of taking notice. A party may request judicial notice at any stage of the proceeding but shall not do so in the hearing of a jury. Before taking judicial notice of a matter in its instructions to the jury, the court shall inform the parties before closing arguments begin.
G. Instructing jury. In a civil case, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.
In Elliott v. U.S. Fidelity & Guar. Co., 568 So.2d 155 (La.App. 2 Cir.1990), the court observed:
Disputed facts are not in the same vein as the laws of nature, geographic and historical facts, time, laws and other matters of common knowledge. The resolution of disputed issues of material fact by judicial notice is improper. Pierce v. Board of Supervisors of Louisiana State University, 392 So.2d 460 (La.App. 1 Cir.1979).
The value of lost meals and clothing are those types of facts which are disputed. Consequently, we find that the trial court was not entitled to take "judicial notice" of the loss of found or the amount thereof. *208 The record reflects that plaintiff did not offer any evidence as to the value, per day, of meals and clothing or as to how many days the plaintiff would have been entitled to receive meals and clothing. Accordingly, we hold that the trial court did, indeed, err in awarding plaintiff $41,222.00 for "loss of found." This award of the trial court is obviously manifestly erroneous and will be annulled and set aside.

APPLICABILITY OF THE DIRECT ACTION STATUTE
In pre-trial, GARD filed exceptions of no cause and/or right of action, alleging among other things that it could not be sued under the Direct Action Statute, LSA-R.S. 22:655, because that statute did not apply to "ocean marine and foreign trade insurances" quoting LSA-R.S. 22:611 which provides that "the applicable provision of this [Insurance Code] shall apply to insurance other than ocean marine and foreign trade insurances." GARD now alleges on appeal that the trial court erred in denying GARD's exception of no cause and/or right of action. We do not agree.
R.S. 22:655 allows a plaintiff to proceed directly against an insurance company who has issued a policy or contract of liability insurance. In Quinlan v. Liberty Bank and Trust, 575 So.2d 336, 347 (La. 1991) the court held that the statute "applies to any insurance against the liability of the insured for the personal injury or corporeal property damage to a tort victim, regardless of whether the policy is formed in liability or indemnity terms[.]" [Emphasis supplied]. It has been held that protection and indemnity insurance, and more particularly, ocean marine indemnity insurance is subject to the Direct Action Statute. Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230 (5th Cir.1969), cert. denied, Nebel Towing Co. v. Olympic Towing Co., 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970); Cushing v. Maryland Cas. Co., 198 F.2d 536 (5th Cir.1952) rev'd. on other grounds 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954).
In Coleman v. Jahncke Service, Inc., 341 F.2d 956, 960-61 (5th Cir.1965), cert. denied, Jahncke Service, Inc. v. Greater New Orleans Expressway Commission, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966), the court said:
LSA-Rev. Stat. 22:611 provides that the Louisiana Insurance Code `shall apply to insurances other than ocean marine and foreign trade insurances.' The district court, however, held that the policy issued to Jahncke, although a policy of hull insurance, was also a public liability policy, subject to the Code, and therefore to the Direct Action Statute. The policy insured Jahncke against liability for personal injury or property damage caused by the Claribel. The direct action statute, by its terms, applies to every `policy or contract of liability insurance.' Though historically no love has been lost between the direct action statute and the Fifth Circuit, we resist the temptation to manacle an old and now beaten enemy. `There is no indication in sec. 655 that the Louisiana legislature intended to deny the right of direct action to persons covered by maritime policies, while extending it to all others.
Accordingly, we agree with appellee's contention that, the general language at the beginning of section XIV (LSA-R.S. 22:611, supra) of the insurance code does not supersede the more specific language of the Direct Action Statute which allows a plaintiff to proceed directly against all liability policies, including ocean marine indemnity insurance policies.
The defendants cite Deshotels v. SHRM Catering, 538 So.2d 988 (La.1989); Backhus v. Transit Cas. Co., 549 So.2d 283 (La.1989) and Sifers v. General Marine Catering Co., 892 F.2d 386 (5th Cir.1990) in support of their contention that the direct action statute does not apply to ocean marine insurance. These cases involved the claims against the Louisiana Insurance Guaranty Association (LIGA). We find these cases distinguishable or inapplicable from the instant case and decline to follow them.[4] We are not bound by these decisions and decline to follow them.
Accordingly, we conclude that the trial court correctly denied GARD's exception of *209 no cause and/or right of action concerning the Direct Action Statute.

PROOF OF INSURANCE COVERAGE.
GARD alleges that the trial court erred in finding them liable in solido because the plaintiff failed to prove any insurance coverage by GARD for Atlantia and/or MOC, and/or the terms and conditions of such coverage.
The burden of proof is on the plaintiff to establish every fact in issue which is essential to his cause of action or right of recovery, including the existence of the policy sued on, its terms and provisions, and that his claim is within its coverage. Vallery v. All American Life Ins. Co., 429 So.2d 513 (La.App. 3 Cir.1983); writ denied, 434 So.2d 1091, 1100 (La.1983); Gulf Wide Towing v. F.E. Wright (U.K.)., 554 So.2d 1347 (La.App. 1 Cir.1989); Barber v. Best, 394 So.2d 779 (La.App. 4 Cir.1981).
A review of the record reflects that plaintiff failed to meet its burden of proof against GARD. GARD refused, in the beginning of the trial to stipulate to its policy (as is usually done) and plaintiff failed to introduce the policy into evidence or otherwise prove any terms and conditions of any such policy.
The only evidence in the record to prove the existence and extent of insurance coverage *210 is GARD's answer to plaintiff's amended petition and Atlantia's answer to interrogatory No. 8. In its answer, GARD admitted that it provided to the M/T Atlantia, and her owner, a contract of protection and indemnity, insuring against "certain specifically enumerated protection and indemnity risks." Atlantia, in answering interrogatory No. 8, said "Atlantia Tanker Corporation is insured by Assuranceforeningen GARD." No other evidence of the existence or extent of insurance coverage was introduced or admitted.
Since GARD admitted that some type of insurance coverage existed, the plaintiff was entitled to use this confession to prove its case. However, there is nothing in the record which proves the terms and provisions of the policy and/or that the coverage provided by the policy encompasses plaintiff's claim against Atlantia. Whereas we conclude that GARD is technically correct in requiring the plaintiff to introduce the policy and prove that it covers the negligence and damages proven, we also do not feel that equity or the ends of justice would be served by allowing GARD to escape their just liability through such technical legal maneuvering since both GARD and Atlantia and MOC admitted the existence of a policy. Accordingly, since we have ample precedence from other courts for this action, we remand the case to allow plaintiff to obtain and introduce into evidence the policy and/or evidence of its terms and provisions and the scope of its coverage, all of which can be decided by the trial judge. Mitchell v. Wall, 482 So.2d 817 (La.App. 4 Cir.1986); Balehi Marine v. Fireman's Ins. Co. of Newark, 460 So.2d 16 (La.App. 1 Cir.1984), writ denied, 462 So.2d 654 (La.1985); Lucas v. Doe, 371 So.2d 336 (La.App. 4 Cir.1979); Carriere v. Triangle Auto SVC, 340 So.2d 665 (La. App. 4 Cir.1977).

DENIAL OF CONTINUANCE.
On September 28, 1990, the first day of trial, GARD sought a continuance, alleging that it had no knowledge of the alleged defective condition of the control lever of the winch until September 11, 1990, when plaintiff's deposition was taken. The motion for continuance was denied and GARD applied to this Court for supervisory writs. This Court refused to issue writs and denied relief, finding no abuse of the trial court's discretion. On appeal, GARD again alleges as error the trial court's denial of its motion for continuance.
"A continuance may be granted in any case if there is good ground therefor." LSA-C.C.P. art. 1601. Such a determination is within the sound discretion of the trial court. Ten Point Properties, LTD v. Roussel, 506 So.2d 179 (La.App. 5 Cir. 1987).
The trial court, in denying the motion, stated that the pleadings of plaintiff raised the issue of the defective condition of the control lever, and therefore all parties had notice of this issue from the inception of the lawsuit.
Although we feel our previous denial of supervisory writs is the "law of the case" (as per our previous discussion herein), nevertheless, in an abundance of caution and fairness, we have reviewed this issue again, see no reason to change our previous position and, once more, we find no abuse of discretion in the trial court's ruling denying GARD's motion for continuance.

DISPOSITION:
In accordance with our previous discussion herein, the judgment in favor of plaintiff, and against Atlantia and MOC finding them liable, in solido, for damages incurred by plaintiff is amended to read as follows:

*211
 1. Medical expenses, future $ 40,000.00
 2. Past loss of net earnings 22,642.00
 3. Future loss of net earnings $200,000.00
 4. Past loss of "found" -0-
 5. Future loss of "found" -0-
 6. Past physical pain and suffering 85,800.00
 7. Future physical pain and suffering 128,400.00
 8. Past mental anguish and loss of enjoyment of life 85,800.00
 9. Future mental anguish and loss of enjoyment of life 128,400.00
10. Past Disability and disfigurement 68,640.00
 Present and Future Disability and disfigurement 102,960.00
 ___________
 TOTAL $862,642.00
 ===========

The judgment is further amended to allow interest from date of judicial demand for the awards for past loss of net earnings, past physical pain and suffering, past mental anguish and loss of enjoyment of life and past disability and disfigurement. Interest is awarded from date of judgment for the awards for future medical expenses, future loss of net earnings, future physical pain and suffering, future mental anguish and loss of enjoyment of life and present and future disability and disfigurement.
The judgment in favor of plaintiff and against GARD, finding them liable, in solido, with the other defendants is set aside and the case is remanded for final outcome further proceedings in accordance with and not inconsistent with this opinion.
Each party is to bear his own costs.
AMENDED, AND AS AMENDED, AFFIRMED IN PART; SET ASIDE AND REMANDED IN PART.
NOTES
[1] An owner pro hac vice is:

... one who assumes by charter or otherwise `exclusive possession, control, command, and navigation' of a vessel for a specific period of time. An owner pro hac vice `has complete though perhaps only temporarydominion over the vessel entrusted to him. He commands her navigation and is entitled to avail himself fully of her services.' `It is therefore tantamount to, though just short of, an outright transfer of ownership.' [Citations omitted].
Bernier v. Johns-Manville Sales Corp., 547 F.Supp. 389, 394 (1982).
[2] In the original general damage award, the individual elements were proportionate to the whole in the following percentages: Past physical pain and suffering14.3%; future physical pain and suffering21.4%; past mental anguish and loss of enjoyment of life14.3%; future mental anguish and loss of enjoyment of life 21.4%; and disability and disfigurement28.6%. Furthermore, the past awards compared to the future awards in a ratio of 2 to 3. Accordingly, in reducing the award, we have utilized the same percentages.
[3] "Found" is a term peculiar to admiralty cases. It is usually defined as the sum which represents the living expenses furnished to the seaman by his employer as a condition of employment. Maraist, Admiralty in a Nutshell. It includes such elements as a seaman's daily meals and his clothing.
[4] In Deshotels, supra at 992-93, the court stated that:

The Louisiana Insurance Code does not define `ocean marine' insurance. That insurance is not only excluded from LIGA coverage but also from the scope of Part XIV, which applies to `The Insurance Contract' and includes the Louisiana direct action statute. In context, the term `ocean marine' is used as a synonym for traditional marine insurance, that is, property insurance on hulls, freights and cargoes. Blair [v. Sealift, Inc.], supra. It contrasts with the definition of marine protection insurance in LSA-R.S. 22:6(13)(e), which is insurance against liability for death or personal injury resulting from use of a vessel `in ocean or inland waterways.'
Sifers, Coe [v. L & L Sandblasting, Inc., 707 F.Supp. 874 (W.D.La.1988) ], George [v. Bailey Coke and Transport, Inc., 672 F.Supp. 926 (E.D.La.1987) ], Day and Backhus erred in equating all insurance covering maritime claims with `ocean marine' insurance.
LSA-R.S. 22:1377 states that Guaranty Association insurance applies `to all kinds of direct insurance, except life, health and accident, title, disability, mortgage guaranty, and ocean marine insurance.' These categories enumerate different kinds of insurance policies, rather than different risks. It follows that the exclusion for ocean marine insurance does not apply to employers' liability policies which incidentally cover risks associated with maritime activities.
In view of the liberal construction given LIGA's protection to the insureds of insolvent companies, it would be anomalous to allow employees to walk in and out of LIGA protection as they board or disembark from a vessel. LIGA has accepted premiums for this covered claim and cannot now deny coverage. An insurance policy which insures an employer against liability to employees is not a policy of `ocean marine' insurance merely because it embraces some maritime risks.
In Deshotels, a protection and indemnity policy such as the one in this case was not considered an ocean marine policy.
In Backhus v. Transit Cas. Co., supra, the court found that under the definitional statutes in the LIGA code, marine protection and indemnity policies fell within the scope of ocean marine insurance. Two members of the Backhus court dissented.
In Sifers, supra, the Fifth Circuit followed Backhus, and found that plaintiffs who have suffered personal injuries and defendants who have been forced to pay for those injuries have no recourse against LIGA pursuant to defendant's protection and indemnity policy, as those policies, under LIGA statutes, were policies of marine insurance.
More recently, in Delaune v. Saint Marine Transp. Co., 749 F.Supp. 1463 (E.D.La.1990), the court held that the Louisiana Supreme Court in Deshotels and Backhus implicitly overruled the holding in Cushing, supra and its progeny, (including Coleman, supra) that under Louisiana state law a direct action may be asserted against a marine protection and indemnity policy. See also Perreira v. Saint Marine Transp. Co., 1991 A.M.C. 1213, 1990 WL 299890 (E.D.La.1990).
Furthermore we note that the federal courts of Eastern District of Louisiana are not uniform in this conclusion.
In Tassin v. Hess Marine, 1990 W.L. 93831 (E.D.La., June 28, 1990) and in Butler v. Western Company, 1990 W.L. 93855 (E.D.La., June 28, 1990), the plaintiff was allowed to proceed directly against the insurer of the ship owner/employer. The court refused to apply Backhus and Sifers, citing Cushing and Coleman and held:
There is no indication that the legislature intended that the term `ocean marine insurance' as used in Section 22:611 should be applied to Section 655 to deprive injured persons of the right to bring a direct action against an insurance company merely because the policy in question is a "protection and indemnity' policy while we certainly are not bound by these cases emanating from the federal district courts, they add strength to our position here.
Tassin v. Hess Marine, supra.