640 So.2d 552 (1994)
James C. CORMIER and Mrs. James C. Cormier, Plaintiffs-Appellees/Appellants Intervenor-Robert B. Keaty,
v.
CLIFF'S DRILLING COMPANY, the United Kingdom Mutual Steamship Assurance Association (Bermuda) Ltd Mt & Order to Dis & Cliff's 6/9/92 Barge No. 2, Defendants-Appellants/Appellees.
No. 93-1260.
Court of Appeal of Louisiana, Third Circuit.
May 4, 1994.
*554 Thomas Joseph DeJean, Opelousas, and Robert Burke Keaty, Lafayette, for James C. Cormier, etc.
Walter Kay Jamison, III, Lafayette, for Cliff's Drilling Co., et al.
Before YELVERTON and THIBODEAUX, JJ., and CULPEPPER,[*] J. Pro Tem.
YELVERTON, Judge.
A jury found that on September 27, 1990 Cliff's Drilling Company was negligent on board the barge B-2, and that its negligence was a legal cause of damages to the plaintiff under Jones Act standards. It also found that the barge B-2 was unseaworthy and that this was a proximate cause of the injury to the plaintiff. It found that Cormier himself was not negligent.
There were two accidents in this case and separate interrogatories for each accident. The jury found that Cliff's Drilling Company was again negligent on February 17, 1991 and that such negligence was a legal cause of further damages under the Jones Act standard. Likewise it found that the barge B-2 was unseaworthy on February 17, 1991, and that that unseaworthiness was a proximate cause of that injury. Again, it found that Cormier was himself not negligent.
The jury awarded $165,772 in general damages. It fixed past loss of earnings at $29,228 and awarded $300,000 for future loss of earnings, with damages for loss of fringe benefits set at $5,000. The jury apportioned the damages attributable to each accident at 70% for the September 27 accident and 30% for the February 17 accident.
The trial judge granted a JNOV as to fringe benefits and reduced that award from $5,000 to $1,809.22. The trial judge further ordered a remittitur as to the future loss of earnings award, reducing it from $300,000 to $276,485.64. The plaintiff consented to the remittitur as an alternative to a new trial.
*555 All defendants (herein collectively Cliff's) appealed, assigning error as to findings of fault, excessiveness of the general damage award, and excessiveness of the reformed judgment for future loss of earnings. Cliff's also urges as error the exclusion of certain purported impeachment evidence.
The plaintiff, Cormier, also appealed. He seeks the reinstatement of the jury award for loss of future earnings. He makes no complaint as to the reduction of the fringe benefits award.
We find no manifest error in the jury's determinations of negligence and unseaworthiness. We find no abuse of discretion in the jury's determination of general damages. On the subject of loss of future earnings, we find that the jury's award was reasonable, and we reinstate the award of $300,000. Our reasons follow.

LIABILITY
The standard of review of the jury's findings of negligence and unseaworthiness, and its finding that Cormier was not contributorily negligent, is the manifest errorclearly wrong standard. The plaintiff argues our standard of review is the federal standard of "reasonable evidentiary basis", citing Barks v. Magnolia Marine Transport Co., 617 So.2d 192, 194 (La.App. 3rd Cir.), writ denied, 620 So.2d 876 (La.1993). We acknowledge that Barks so holds, but Barks, we now believe, was in that respect wrong. By way of explanation, this court at one time applied the federal standard of review in Jones Act and maritime cases: West v. State Boat Corp., 458 So.2d 647 (La.App. 3rd Cir. 1984); Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984). However, in Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986), our supreme court held that in these cases the procedural law of Louisiana controls as to the scope of appellate review. We followed this ruling in Hanks v. Barge Transport Co., Inc., 563 So.2d 1297 (La.App. 3rd Cir.), writ denied 569 So.2d 964 (La. 1990), but did not follow it in Barks, 617 So.2d at 194. As stated in Hanks, we apply our manifest error standard of review of facts.
Evidence of even the "slightest" negligence is sufficient to sustain a finding of Jones Act liability. Babineaux v. Lykes Bros. S.S. Co., Inc., 608 So.2d 659-3. 3rd Cir.1992), writ denied, 610 So.2d 819 (La.1993). A Jones Act employer has the duty to exercise care to maintain a reasonably safe work environment. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982). The burden on the plaintiff for showing causation is "featherweight". Johnson v. Offshore Exp., Inc., 845 F.2d 1347 (5th Cir. 1988). Reviewing the issue of the plaintiff's contributory negligence, we keep in mind that a seaman's duty is to do his work as he is instructed and his duty to protect himself is slight. Babineaux, 608 So.2d at 662.
To be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended. A vessel owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing injury and that the injury was either a direct result or reasonably probable consequence of unseaworthiness. Johnson v. Offshore Exp., Inc., 845 F.2d 1347 (5th Cir.1988).
Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, each involving separate standards of proof and causation. Id. In the present case, the jury found that Cliff's was liable under both the Jones Act and unseaworthiness theories, and we find no manifest error in either finding.
Cormier was a derrickman on a drilling barge owned by Cliff's. In his first accident he was in the derrick pulling pipe out of the hole. His right foot was on the right foot pad and his left foot was on the monkeyboard. He slipped while racking back the pipe, tearing the medial meniscus in his right knee. At the time of this accident, Cliff's was drilling for Louisiana Land and Exploration (LL & E).
*556 Cormier did not take any time off after this accident and continued to work for Cliff's, but he was assisted in his work by his fellow crew members. Cliff's next job was for Texaco which began in January 1991. On February 17, 1991, Cormier was again pulling pipe out of the hole when the second accident occurred. He slipped again on the same monkeyboard and aggravated the earlier injury to his right knee.
With regard to Cormier's first accident, several hands working in the derrick testified as to the condition of the barge and the monkeyboard on which the derrickman had to stand to pull out pipe. Blaine Villemarette, Joseph LeJeune, Albert Johnson, Paul Hanks, and Robert Waldren all testified that the barge was leaning excessively. This was because they were working in a marsh area. This lean made it hard on the derrickmen because they were required to pull harder to get the pipe up.
James Broussard, the toolpusher on Cormier's shift who oversaw all operations on the rig, testified that there were problems on the LL & E job with the derrick leaning. He stated that this lean made it harder on the derrickmen. He also stated that the barge had never been out of lean that much. The lean on the LL & E job had been discussed at safety meetings.
There was also a lean on the Texaco job where Cormier's second accident occurred, but it was not as bad as on the LL & E job. The problem on the Texaco job was mainly the condition of the monkeyboard.
The condition of the monkeyboard in the derrick, on both the LL & E and Texaco jobs, got a lot of attention at the trial. The monkeyboard is what the derrickman stands on as he pulls out pipe. It is supposed to be level with the right foot pad because that is what the derrickman puts his foot on for balance. Testimony from several of the workers revealed that the monkeyboard was not level with the right foot pad. They said there was a difference of 4 to 8 inches. As a matter of fact, they had begun the practice of stuffing rope underneath the monkeyboard to level it up with the right foot pad, but that makeshift correction was not very effective and never lasted long.
Broussard testified that the rope would not support the monkeyboard. George Horten, the director of safety and personnel for Cliff's, admitted that a bad monkeyboard should be repaired instead of sticking ropes underneath it. Edward Robert, a safety consultant who was an expert in safe drilling procedures, also stated that it was not good to stick rope under the monkeyboard. He testified that an unlevel rig combined with an unlevel, bent monkeyboard was an undue hazard. Balancing and footing are the most important aspects of safety for a derrickman.
The testimony of many witnesses over four days of trial overwhelmingly established that Cliff's was negligent in allowing Cormier to rack pipe under these conditions. The monkeyboard and right foot pad were still unlevel on the Texaco job. The monkeyboard was eventually replaced after Cormier's second accident. Both of plaintiff's accidents occurred when his right foot slipped off the right foot pad. If the monkeyboard and foot pad had been level, it is probable that Cormier's foot would not have slipped and he would not have been injured. There was no clear error in the jury's conclusion that Cliff's was negligent and had provided an unseaworthy vessel.
Cliff's does not contend that it was not negligent for the first accident. It claims that the jury erred in not finding that Cormier was contributorily negligent for his own accident because he was not watching for mud in the area which was an obvious danger and he was also negligent in the manner in which he was racking the pipe.
Cliff's also claims that it was not liable at all for the second accident since it occurred in the same manner as the first accident and Cormier should have learned that the procedure he was using to rack pipe was clearly a hazard.
Cliff's claims that Cormier was contributorily negligent for not cleaning mud in his work area and for using an improper procedure to rack pipe. Comparative negligence applies in both Jones Act and unseaworthiness actions. In Jones Act and unseaworthiness actions, defendant has the burden *557 of proving that plaintiff was contributorily negligent and that such negligence was a proximate cause in producing his injury. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989).
At trial, Cormier stated that there would be mud in the area when pulling pipe which was not unusual. On the day of the first accident, there was some mud on the monkeyboard. However, Cormier did not recall the mud giving him any problem. Robert, Cormier's expert, testified that a derrickman should check his equipment and area and clean when he can, but in this case, there was no evidence at trial that mud contributed to Cormier's accidents.
Cliff's also claims that when racking pipe Cormier should have placed both feet on the monkeyboard as opposed to one foot on the monkeyboard and one foot on the foot pad. The expert, Robert, stated that it was an unsafe practice to rack pipe walking with the right foot on foot pad and the left foot on the monkeyboard. Others testified that the job was routinely done that way. Broussard, the tool pusher, testified that the derrickman stands on the monkeyboard and right foot pad. This was what Cormier was doing in both accidents. Also, Cliff's expert in oil field practices and procedures, R.B. Linke, stated he would not use the foot pad but that did not mean that others did not. He said it was fine for others to use it.
Considering the slight duty that a seaman has in a Jones Act claim to protect himself, there is a complete absence of probative facts that Cormier was contributorily negligent. Nor can we say under the clearly wrong standard that the jury was wrong in finding no contributory negligence in the unseaworthiness claim. Mud had not caused Cormier a problem and nobody else testified that mud had been a problem. Also, there was no evidence that the procedure Cormier was using to rack pipe at the time of his accident was improper.
This was a lengthy trial with 27 witnesses. Some witnesses said that the working conditions, particularly the difference in elevation between the monkeyboard and the right foot pad, were dangerous; others said that they were not. There were experts on both sides. As indicated by the excellent briefs filed herein by the attorneys, there are two permissible views of the evidence. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989). Judged by the manifest errorclearly wrong standard of review, we find no error.

IMPEACHMENT EVIDENCE
Cliff's contends that the trial court erred in refusing to allow it to introduce the testimony of John McGuffee to impeach the testimony of the witness Villemarette. It attempted to impeach Villemarette's testimony with an alleged oral statement made by Villemarette to McGuffee prior to trial which it claims differed from his testimony at trial. The alleged oral statement had to do with the lean of the derrick on the Texaco job.
Villemarette testified, as did a number of other witnesses, that on the LL & E job there were two dangerous problems for the derrickman. One was the bad lean of the derrick, and the other was the unlevel condition of the monkeyboard. When they moved to the Texaco job, Villemarette's testimony was that the same monkeyboard was used and that its condition was in the same bad and unlevel shape. He never testified on direct examination that there was any lean to the derrick. On cross-examination, Villemarette was asked if he remembered talking to Mr. McGuffee a week before the trial. Villemarette remembered. He was asked if he recalled telling McGuffee that on the Texaco job there was no problem at all with the rig leaning or being tilted. He denied telling him that. Explaining, Villemarette said that he told him there was a lean but it wasn't significant on the Texaco job.
The impeachment testimony of Mr. McGuffee which the trial judge refused to let the jury hear, was as follows:
Q. Did you ask him when you talked to him face to face whether there was any problems on the Texaco job with the rig tilting or leaning?
A. Yes, sir.
Q. What did he tell you?

*558 A. He said there was none that he could recall.
La.Code of Evid. art. 607(D)(2) allows a party to attack the credibility of a witness with extrinsic evidence, including prior inconsistent statements when it is offered solely to attack the credibility of a witness, unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues or unfair prejudice.
In a colloquy between the court and counsel concerning this objection, the trial court recalled the testimony of Villemarette fairly accurately and decided, for several reasons, that the objection was good.
On this appeal, Cliff's argues that the reasons given by the trial judge for excluding the testimony were unsound from a legal standpoint. No purpose would be served by discussing the reasons given by the trial judge for his ruling, because we find that it was correct in any event. The quotations above clearly show that there was no real inconsistency in the prior statement. Whatever slight probative value this evidence on the issue of credibility might have had, it was substantially outweighed by the risks of undue consumption of time, confusion of the issues, and unfair prejudice. We find no merit to this assignment of error.

GENERAL DAMAGES
Cliff's also contends that the jury's award of $165,772 was excessive. The standard for appellate review of general damage awards is whether there has been an abuse of discretion, and the discretion vested in the trial court is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993). In determining whether the trier of fact has abused its much discretion in its award, the appellate court must first examine the individual circumstances of the particular case and not prior awards. Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3rd Cir.), writ denied 616 So.2d 701, 702 (La. 1993).
The evidence at trial revealed that as a result of these two accidents, Cormier will be partially permanently impaired. He suffered a medial meniscus tear in his right knee. Cormier went to the emergency room after his second accident and was referred to Dr. John Budden, an orthopaedic surgeon. Dr. Budden noted that he had fluid and swelling in the right knee. Dr. Budden felt the meniscus was torn by the first accident. Dr. Budden performed arthroscopic surgery to repair the tear on March 21, 1991.
Cormier next saw Dr. James Lafleur, another orthopaedic surgeon on May 16, 1991. On May 28, 1991, an MRI showed a possible recurrent meniscal tear. Dr. Lee Leonard examined Cormier on July 17, 1991, and then performed a repeat arthroscopic surgery on the knee.
The last doctor to see Cormier was Dr. Michael Brunet, an orthopaedist with the Tulane Medical Center. He first saw Cormier on August 17, 1992. His examination revealed an abnormal range of motion and a lot of scarring on the kneecap in the right knee. Dr. Brunet diagnosed Cormier with a condition known as Patella Baha. He explained this condition as an infrequent, but serious complication of a surgical procedure such as arthroscopic surgery. He felt it was a complication of the first arthroscopic surgery.
On September 10, 1992, Dr. Brunet performed a procedure to release the kneecap so Cormier could straighten his leg. This was an open surgery in which Dr. Brunet went into the knee and cut out all the scar tissue. Dr. Brunet said that historically the success rate of that procedure was not good, and it failed on Cormier.
On November 3, 1992, Dr. Brunet performed another procedure on Cormier's knee. Cormier was given a general anesthesia and his knee was bent forcefully to try to break up some of the scarring. He had been losing motion and this procedure was an effort to put his knee back in the position it was before, which was a partially bent knee.
Dr. Brunet stated that Cormier's knee would never be able to bend any better than it could when he last saw him. He explained *559 that Cormier had two problems, a cartilage tear and a subsequent breakdown of the joint over a period of time. The lack of motion in the knee would not get any better. Cormier would also have permanent pain. He would not be able to squat, climb, kneel or endure prolonged standing. He would have swelling when he overdid his knee. Dr. Brunet explained, as an example, that Cormier could not even push-mow grass on a 50' × 100' lot without paying a price for it.
Cormier testified that he had to prop his knee up or it would get numb and sore. His knee also swells. He stated that he could not remember the last time his knee did not hurt. He cannot get comfortable when he tries to sleep. Knowing his knee will not get any better has depressed him. He cannot do anything with his friends, cut the grass or go dancing with his wife.
Given the fact that Cormier had to endure four procedures to his right knee and that he has suffered a permanent disability which has placed severe limitations on his activities, we cannot say that an award of $165,772 for general damages is unreasonable.

FUTURE LOST WAGES
"In reviewing a judgment reformed in accordance with a remittitur or additur, the court shall consider the reasonableness of the underlying jury verdict." La. Code Civ.P. art. 2083 B. In Karl v. Amoco Production Co., 507 So.2d 263 (La.App. 3rd Cir.), writ denied 512 So.2d 461 (La.1987) we held that in reviewing a reformed judgment the jury's decision is not considered at all. In 1989, the legislature amended La.Code Civ.P. art. 2083 to add the language quoted at the beginning of this paragraph. In Lougon v. ERA Aviation, Inc., 609 So.2d 330 (La.App. 3rd Cir.1992) we recognized that this amendment legislatively overruled the prior jurisprudence, including Karl, 507 So.2d at 265. In Hodapp v. American Indemn. Co., 618 So.2d 32 (La.App. 3rd Cir. 1993), we stated that under the new standard of review, the appellate court should review the jury's award for abuse of discretion, and the trial court abuses its discretion in granting an additur or remittitur when the jury's award is within the range of its discretion. Therefore, we will review the reasonableness of the jury's award of $300,000 for future lost wages according to the abuse of discretion standard.
In Jenkins, 613 So.2d at 1104, this court laid out the basis for future lost wage calculations as follows:
It is well settled that future lost wage calculations in maritime cases are to be performed in compliance with the method set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (en banc), cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), commonly known as Culver II. This case established a four step process for determining lost wages as follows:
(1) Estimate the loss of work life resulting from injury;
(2) Calculate the lost income stream;
(3) Compute the total amount of damages;
(4) Discount the total amount to its present value.
The lost income stream is calculated by adding gross income at the time of injury to other income (fringe benefits) then subtracting required payments by the wage earner (such as taxes and work expenses). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned... If forecasts of future inflation are not used, it is necessary for the factfinder to choose an appropriate below market discount rate, which process is concededly difficult". Culver, supra, at 122.
The jury and the trial court based their respective awards of $300,000 and $276,485.64 on Donald Cornwell's testimony. He was the economist who testified on behalf of Cormier. Cornwell had calculated that Cormier would have a loss of $355,166.41 if Cormier never returned to work. If he returned to work at minimum wage a year from the date of trial, his loss would be $276,485.64. A review of Cornwell's testimony and his calculations reveals that he substantially *560 complied with the process established in Culver II.
Cormier had a sixth grade education. He failed several times and was 17 years old when he finished the sixth grade. He went to work in the oil field and had worked up to derrickhand in the last twelve years. He was 39 at the time of the accident and 41 at the time of trial.
Dr. John Grimes, a professor of psychology and a vocational rehabilitation counselor, testified that in testing his intellectual functioning, he found Cormier was in the mild mental retardation range, although he probably functioned at a higher level. He also stated that without his present disability, Cormier would be a semiskilled, manual type worker and that the disability took him out of oil field work. He stated that the type of jobs which would be available to Cormier now were minimum wage to $5.50 an hour jobs. His reasoning for this conclusion was because people with less than a high school education get paid for their physical abilities and willingness to take risks. Once they are hurt, they are relegated to entry-level jobs.
Jennifer Palmer was the vocational rehabilitation counselor called on behalf of Cliff's. She found possible jobs for Cormier given his background and medical condition which ranged from $4.50 an hour to $5.00 an hour.
The accident left Cormier without the ability to straighten out his right leg. He cannot squat, kneel, climb or run. Dr. Brunet, the last doctor to treat him, said that he was not going to get any better and he might end up needing a walking cane on an intermittent basis ultimately. Dr. Brunet did not know of any medical treatment that would help him. He said that the cartilage problem would more than likely get worse. He anticipated pain and swelling. Dr. Grimes testified that under these conditions Cormier would have difficulties maintaining employment.
Professor Cornwell's estimate of a loss of $276,485.64 was based on calculations that Cormier would work at minimum wage every day for the remainder of his 19.31 years of work-life expectancy.
Dr. Cornwell also testified that he did not take into account for future lost wages the value of the food which Cormier was given free when he was working on board the vessel as a future lost fringe benefit. If this were taken into account, then his total economic loss would be $392,719.67.
The jury heard all of this testimony. The jury was aware that Dr. Cornwell's calculations had been based on the assumption that Cormier would work every day for his remaining work-life expectancy. They also heard testimony that rendered it highly doubtful that he would work every day for that period. They heard the testimony that Dr. Cornwell did not take into account the lost benefit of free food as a fringe item that Cormier could not expect to earn in the future. The trial judge's reason for reducing the amount of the award to $276,485.64, was because this was Dr. Cornwell's testimony. Cliff's asked on this appeal that we further reduce this amount because Cornwell's calculations were based on Cormier going back to work at minimum wage a year from trial, whereas there was medical evidence that he could go back to work two months from trial. Even taking these factors into consideration, however, we fail to see how it can be said that the jury's award for future lost earnings of $300,000 was unreasonable. The jury's award was in the range of its discretion and it was an abuse of discretion for the trial court to reduce it. We will accordingly reinstate it.
For the foregoing reasons, the reformed judgment of the trial court is amended to reinstate the jury award for loss of future benefits to $300,000. In all other respects the reformed judgment is affirmed. All costs will be paid by Cliff's.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[*] Honorable William A. Culpepper, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.