670 So.2d 1342 (1996)
Melvin FOSTER and Lou M. Foster
v.
DESTIN TRADING CORPORATION and Blessey Marine Service, Inc.
No. 95-CA-226.
Court of Appeal of Louisiana, Fifth Circuit.
February 27, 1996.
*1344 John J. McKeithen, Rebel G. Ryland, Louis V. Champagne McKeithen, Ryland & Champagne, Columbia, for Plaintiffs-Appellants Melvin Foster and Lou M. Foster.
Daniel E. Knowles, III, Lars O. Perkins Burke & Mayer, New Orleans, for Defendants-Appellees Destin Trading Corp. and Blessey Marine Service, Inc.
Before GOTHARD, CANNELLA and KLIEBERT, JJ.
THOMAS J. KLIEBERT, Judge Ad Hoc.
Plaintiff, Melvin Foster, appeals from a judgment in favor of defendants, Destin Trading Corporation (Destin Trading) and Blessey Marine Service, Inc. (Blessey), dismissing his action under the general maritime law and the Jones Act. (46 U.S.C.App. § 688). We affirm.
Foster and his wife, Lou, filed suit for damages against Destin Trading, as owner of the barges, and against Blessey, as his employer.[1] The matter went to trial on August 8 and 9, 1994. On November 17, 1994, the trial judge dismissed the case and rendered judgment against Foster, finding that he failed to prove that the vessel was unseaworthy or that Destin Trading or Blessey was negligent.
On appeal, Foster asserts that the trial judge erred in failing to find either Destin Trading or Blessey negligent, in failing to find the vessel unseaworthy, and in failing to award damages.
The evidence shows that on September 5, 1991, Foster, the forty-year-old relief captain of the tug/push vessel, the M.V. Laura Ann Blessey, severely injured his ankle while attempting to cross a single plank laid atop the highest portion of two barges 30 to 36 inches from their decks. The vessel was in Houston, tied up next to one barge, which in turn was tied up to another barge which was docked closest to land. At approximately 8:30 p.m., two United States Coast Guard Officers boarded barge WEB 205, the barge moored adjacent to the dock, for a routine inspection. The Blessey tankerman was asked by the Coast Guard to produce his tankerman's certificate, a normal request. He proceeded to the boat where he requested that plaintiff retrieve the document from his bunk room. Upon returning with the document, the Blessey tankerman informed plaintiff that he believed the Coast Guard was about to issue a citation, not to Blessey, but to the land-based Houston Fuel Oil tankerman, for discharging cargo with one of the hatch covers open. Despite the fact that Blessey personnel were not in charge of the operation, plaintiff decided to walk to the scene.
Plaintiff got off of M/V LAURA ANN BLESSEY and stepped onto barge WEB 206 at a point approximately three quarters of the way down her length. The Coast Guard Officers and the land-based tankerman were standing near the midpoint of barge WEB 205, closer to the dock than the exact center of the barge.
Barges WEB 205 and WEB 206 are nearly identical tank barges, both having a four-foot walkway surrounding a flat tank top elevated 30 inches above the walkway. The two barges were Coast Guard inspected at the time of the accident and the Certificates of Inspection for both barges were admitted into evidence. The tank tops of both barges have hatch covers located at the midpoint and at both ends. At the time of the accident, three 2" × 12" by 16' pressure treated *1345 pine boards extended across from the tank top of WEB 205 to WEB 206 at points approximately even with each of the hatch covers. Since the two barges were tightly cabled together at the time of the accident, the distance between the tank tops consisted only of the width of the two four-foot walkways surrounding each of the tank tops, or eight feet. At the level of the walkways, the two barges were cabled flush together leaving no gap. Foster was moving across a walkway from the barge adjacent to the tug to the second barge. As Foster moved across the board, it broke, causing him to fall to the deck 30 to 36 inches below. He was taken to Hermann Hospital in Houston, where he underwent surgery to his foot and ankle. Two screws were placed in his ankle. He weighed 325 pounds at the time of the accident and had a preexisting deteriorating disc condition of the lumbar spine, which was not reported to Blessey in his application.
On the date of the accident, Foster was acting as relief captain. The testimony showed that the captain or the relief captain, if he was on duty, had ultimate authority over the operations and safety of the crew and vessel, that the captain was responsible for ordering supplies for the vessel, that the supplies were delivered to the vessel, and that the captain checked the supplies as they were delivered. The list of needed supplies was faxed to the Blessey office, where is was reviewed and sent to the supplier. In this case, at the request of Foster and the tankerman, three planks of oak wood, size 2" × 12" × 16', were ordered. The supplier, however, delivered three pine boards instead. The witnesses were unable to state with any certainty who changed the order, but the evidence indicated that the Blessey port engineer checked orders as they came in and probably changed the order to pine because pine boards were customarily used for replacement boards in the holds of the tug vessels. Neither the captain nor Foster complained about the order.
Foster testified that he had worked as a tankerman, deck hand, steerage man, and relief captain for more than seventeen years. He testified that he had worked on three of the Blessey vessels and was promoted to relief captain on the last job. He stated that he and a tankerman discussed using the boards as a walkway with the captain because the tankerman requested it to shorten their routes while working. He noted that this was common practice by tankermen on other vessels. Foster testified that the captain agreed and that they ordered oak boards at Foster's suggestion because he knew that oak was used for diving boards and would be strong enough to perform as a walkway. He testified that he did not know about the strength of pine. Foster stated that the boards had been in use for about one month before the accident. According to Foster, he used the pine boards many times without any problems. On cross-examination Foster stated that he did not remember telling John Riojas, another tankerman, not to use one of the boards on this vessel because it was cracked. He thought that he might have had the discussion on another vessel. He also did not remember holding a discussion with Paul Yates, a tankerman who weighed more than he did, in which Yates informed Foster that he was not going to use the board because it made creaking sounds and he felt unsafe.
Yates testified by deposition. He stated that he was on the Laura Ann Blessey at the time of the accident, but did not witness Foster's fall. He testified that the boards were ordered after a discussion in the galley with George Jones, vice-president of Blessey, Foster, Walter Wyatt, the pilot, and himself. Yates stated that the crew used boards on other boats. He said that he did not know where the order to use the boards came from, but that they were bought for that purpose. At first, he stated, the boards were green and stable. Then, as they dried out, he heard cracking noises when he used the boards. Yates told Foster. Admitting that he weighed 400 to 420 pounds, Yates stated that after that, he discontinued using the board walkway. He denied seeing any cracks in the board that made cracking noise. Yates saw the broken board after the accident and noted that it had a jagged break, 3" to 4" from the end. Yates testified that no one from the company ever reprimanded anyone for using the boards. He stated that George Jones asked him if he used them at *1346 one point, but he told him that he stopped. Yates stated that George Jones just nodded his head.
Walter Blessey, Jr. testified that George Jones no longer worked for the company, but was vice-president at the time of the accident. He stated that George Jones, Mike Hassett and he ran the business. He testified that the duties of the captain were to steer the vessel to its destination, manage the crew, and assign tasks. He noted that some captains are very active with the crew duties and others are not, but remain in the wheelhouse most of the time. He stated that it was against company policy for anyone to use boards for walkways. He testified that he only witnessed one incident, years before, where a worker was using a board to cross from the barge to the shore. He told that person to stop the practice. He stated that the captains were expected to enforce the policy, noting that they were paid $150.00 per day, which were above average wages. He claimed that the captain or relief captain was supposed to let the office know if they received the wrong supplies and that the captains usually were given what they ordered. The office only negotiated price. He noted that the company did not have a written manual or policy at the time of the accident. He testified that policy was communicated verbally to the captains on a one-to-one basis. He testified that Lemar Hirsch was the safety man on duty when Foster was injured. He stated that it was Hirsch's job to visit the vessels, review safety policy and practice, implement policy, and deal with the Coast Guard. He testified that the pine boards were commonly used for other purposes on the vessels, such as repairing rotten wood.
Michael Hassett, a marine engineer who was the operations manager for Blessey in 1991, testified that his job was overseeing the daily operations of the boats and barges, purchasing, and trafficking. He stated that he did not remember the order for the boards, but if it went through his office, he would have reviewed it and forwarded it to the supplier if the delivery was not correct. He would not know if the order was incorrect until he received the dray ticket or until the captain told him. Hassett testified that boards are normally ordered for use in the forward holds to place stores upon or to support hoses during the transfer of chemicals. He testified that it was company policy not to allow boards to be used for walkways, so he assumed that an order for boards was for other reasons. Hassett noted that there was no written policy about the boards, but he stated that he had seen workers use the boards as walkways and told them to stop. He said that he knew that George Jones had told the workers not to use the boards as walkways in the past.
Tankerman, John Riojas, testified that he was on the vessel shortly before the time of the accident. He was regularly assigned to another vessel and had returned to that vessel when the accident occurred. He stated that while on the vessel, Foster pointed out to him a crack in one of the pine boards that the crew had been using for a walkway. Riojas said that Foster told him not to use that board because it was not safe. He testified that it was typical to use one board to cross from barge to barge. Riojas stated that the crack was half of the length of the board through the center and that it could clearly be seen. He stated that despite the defect, the crew, who knew about the cracked board, still used the board because it seemed to be safe for lighter weight men. He noted that he weighed one hundred sixty pounds. However, he also stated that he was not on the vessel when Foster was injured and does not know if the board that broke was the same as the one he had been warned about.
The standard of review of the fact finder's findings regarding negligence and seaworthiness is the manifest error-clearly wrong standard. In Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986), our supreme court held that in these cases the procedural law of Louisiana controls as to the scope of appellate review. Appellate courts have followed this ruling. See Hanks v. Barge Transport Co., Inc., 563 So.2d 1297 (La.App. 3rd Cir.1990), writ denied, 569 So.2d 964 (La.1990) and Cormier v. Cliff's Drilling Co., 93-1260 (La.App. 3rd Cir. 5/4/94) 640 So.2d 552. As stated in Hanks, supra, the manifest error standard of review applies to the review of facts as well as law.
*1347 Foster's claims for unseaworthiness are separate from his claims of negligence. Hae Woo Youn v. Maritime Overseas Corporation, 605 So.2d 187, 198 (La.App. 5th Cir. 1992), modified on other grounds, 623 So.2d 1257 (La.1993). Under general maritime law, a vessel owner has the absolute duty to provide the crew with a seaworthy vessel. Id. In this respect, the vessel, all of the appurtenances and the crew must be reasonably fit and safe for their intended purpose. Otherwise, the vessel is unseaworthy. Youn, supra, at 198. "Reasonably fit" is to be determined by a reasonable man standard. Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir.1980). The vessel owner's actual or constructive knowledge of the unseaworthy condition, his lack of due diligence or negligence are not necessary to support liability, because his duty to provide a seaworthy vessel is absolute. This duty imposes a nondelegable liability, without fault, and is independent of the Jones Act duty to exercise reasonable care. Faul v. State, DOTD, 94-502 (La.App. 3rd Cir. 11/2/94), 649 So.2d 493. A factual finding of unseaworthiness by the trier of fact is reviewed under the clearly erroneous standard. Id. Griffin v. LeCompte, 471 So.2d 1382 (La.1985). However, in order to prevail on an unseaworthiness claim a plaintiff must prove that the vessel was unseaworthy and that the unseaworthy condition was the proximate cause of the injury. Youn, supra, at 198.
The trial judge found the vessel was not unseaworthy. We agree with this finding. The trial court found the use of the boards as a walkway was against company policy and that plaintiff, the vessel relief captain, knew it was against company policy but used the board in this fashion anyway. Company policy allowed the boards to be used as replacement boards in the forward holds or to support hoses during the transfer of chemicals. Although there was testimony the boards were commonly used as a walkway, Blessey did not condone this practice, had in fact advised workers not to use the boards in this fashion, and cannot be held liable where the relief captain knowingly violated company policy and injures himself while violating that policy. We cannot find a vessel unseaworthy when the boards were knowingly being used for a purpose clearly not intended and against company policy.
Under the Jones Act, 46 U.S.C.App. § 688, the seaman is provided a cause of action against his employer for damages he has suffered in the course of his employment as a seaman. The action is only against his employer. Youn, supra, at 200. The general principles of negligence apply to the determination of maritime negligence. See: Uncle Ben's v. Hapag-Lloyd Aktiengesellschaft, 855 F.2d 215, 217 (5th Cir.1988). In order to find the Jones Act employer negligent, Foster must show that it failed to exercise reasonable care to maintain a reasonably safe work environment. Id.; Youn, supra, at 198. The burden of proof of Jones Act is feather light. Id. Only the slightest degree of negligence is sufficient to impose liability on the Jones Act employer. Alverez v. J. Ray McDermott & Co., 674 F.2d 1037, 1042 (5th Cir.1982); Youn, supra, at 198; Babineaux v. Lykes Bros. S.S. Co., Inc., 608 So.2d 659 (La.App. 3rd Cir.1992), writ denied, 610 So.2d 819 (La.1993). Reviewing the issue of the plaintiff's contributory negligence, we keep in mind that a seaman's duty is to do his work as he is instructed and his duty to protect himself is slight. Babineaux, supra, at 662.
Testimony at trial showed that the use of a board as a walkway between barges was against company policy and that Blessey had advised its employees not to use the boards in this fashion. Foster knew the use of the boards in this fashion was against company policy but used the boards as a walkway anyway. We cannot say the trial court erred in finding Blessey exercised reasonable care to maintain a reasonably safe work environment and is therefore not negligent.
For the foregoing reasons, the trial court judgment is affirmed. Defendant to bear all costs of appeal.
AFFIRMED.
CANNELLA, J., dissents with reasons.
*1348 CANNELLA, Judge, dissenting with reasons:

UNSEAWORTHINESS
Foster's claims for unseaworthiness are separate from his claims of negligence. Youn v. Maritime Overseas Corporation, 605 So.2d 187, 198 (La.App. 5th Cir.1992, modified on other grounds, 623 So.2d 1257 (La. 1993). Under general maritime law, a vessel owner has the absolute duty to provide the crew with a seaworthy vessel. Id. In this respect, the vessel, all of the appurtenances and the crew must be reasonably fit and safe for their intended purposes. Otherwise, the vessel is unseaworthy. Youn, 605 So.2d at 198. The vessel owner's actual or constructive knowledge of the unseaworthy condition, his lack of due diligence or negligence are not necessary to support liability, because his duty to provide a seaworthy vessel is absolute. This duty imposes a non-delegable liability, without fault, and is independent of the Jones Act duty to exercise reasonable care. Faul v. State, Dept. of Transp. and Development, 94-502 (La.App. 3 Cir. 11/2/94); 649 So.2d 493, 496.
A factual finding of unseaworthiness by the trier of fact is reviewed under the clearly erroneous standard. Id.; Griffin v. LeCompte, 471 So.2d 1382 (La.1985). However, in order to prevail on an unseaworthiness claim, a plaintiff must prove that the vessel was unseaworthy and that the unseaworthy condition was the proximate cause of the injury. Youn, 605 So.2d at 198.
The question herein is whether the use of a plank was an intended use on the vessel. Defendants claim that company policy prohibited the crews from using wood boards as walkways between barges, noting that the upper parts of the barges are fitted with ladders. Blessey testified that it was easy to sit on the upper section and slide onto the top, if the worker did not want to use the ladder. He testified also that the captains and relief captains were responsible for enforcing policy. However, there is no evidence that "company policy" in regard to the boards was ever told to the captains. The uncontested evidence is to the contrary. Yates, Riojas and Foster testified that improvised wood plank walkways were customarily used by the workers on the Blessey vessels, as well as other vessels. Yates testified that Jones knew of the practice and did not take any action to stop it. Thus, according to the testimony of three witnesses, the boards were being used for their intended purpose as a walkway. Therefore, since the walkway broke, it was unseaworthy. Consequently, I would find the vessel owner 20% liable.

JONES ACT NEGLIGENCE
Under the Jones Act, 46 U.S.C.App. Sec. 688, the seaman is provided a cause of action against his employer for damages that he has suffered in the course of his employment as a seaman. The action is only against his employer. Youn, 605 So.2d. at 200. The general principles of negligence apply to the determination of maritime negligence. See: Uncle Ben's v. Hapag-Lloyd Aktiengesellschaft, 855 F.2d 215, 217 (5th Cir.1988). In order to find the Jones Act employer negligent, Foster must show that it failed to exercise reasonable care to maintain a reasonably safe work environment. Id.; Youn, 605 So.2d at 198. The burden of proof of Jones Act negligence is feather light. Id. Only the slightest degree of negligence is sufficient to impose liability on the Jones Act employer. Alverez v. J. Ray McDermott & Co., 674 F.2d 1037, 1042 (5th Cir.1982); Youn, 605 So.2d at 198. For the same reasons that I would find that the vessel was unseaworthy, I would find the employer 40% negligent. In sum, the employer knew or should have known that the boards were being used in an unsafe manner.

COMPARATIVE NEGLIGENCE
Comparative negligence applies in both Jones Act and unseaworthiness actions. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989); Cormier v. Cliff's Drilling Co., 93-1260 (La. App. 3rd Cir. 5/4/94); 640 So.2d 552, 556. A defendant must prove both, that plaintiff was contributorily negligent and that plaintiff's negligence was a proximate cause of the injury. Miles, 882 F.2d at 984; Cormier, 640 So.2d at 556-557. However, under the Jones Act, 46 U.S.C.A.App. § 688, the seaman's duty to protect himself is slight and, in performing his job, the seaman is not required to find the safest way to accomplish the task.
In this case, there was evidence that one of the boards was cracked down the middle. *1349 However, no one testified that the particular board was the one that broke, causing Foster's fall. The evidence showed that the incident occurred at night. There was lighting, but the area was not brightly lit. When Foster discovered that the Coast Guard was boarding the barge, he hurried to meet them and did not look at the board placed across the barges or check to see if it was the defective board. Thus, there is no evidence that the known defective board caused the fall. There is also no evidence that a seasoned pine board would fail to hold Foster's weight or that he knew that a pine plank would be unsafe to use as a walkway. However, a board did break showing that an unsafe condition existed on the vessel. In regard to Foster's negligence, he was primarily responsible for obtaining the boards to use as a walkway. He admitted that he knew that oak would safely hold the weight of the individual crew members, but knew nothing about the wood that was delivered. As relief captain, he was responsible for the safety of the crew, including himself, but failed to return the pine, although its strength was unknown. He also failed to take action to dispose of the cracked board. As a result, I would find Foster 40% comparatively negligent.
In conclusion, I would find defendants and plaintiff liable for plaintiff's injuries and would award damages.
NOTES
[1] Lou Foster voluntarily dismissed her action during the proceedings.